UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                      Case No. 22-CR-26

JAMEEL BRADLEY, SR.,
a/k/a "BLACK," "CHRIS,"

        Defendant.

---

## PLEA AGREEMENT

1.      The United States of America, by its attorneys, Richard G. Frohling, Acting United States Attorney for the Eastern District of Wisconsin, and Elizabeth M. Monfils and Erica J. Lounsberry, Assistant United States Attorneys, and the defendant, Jameel Bradley, individually and by attorney Mark S. Rosen, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.      The defendant has been charged in 3 counts of a 33-count second superseding indictment with violations of Title 21, United States Code, Sections 841(b)(1)(A), 841(b)(1)(B), and 846; and Title 18, United States Code, Sections 1956(h), 924(c)(1)(A)(i), and 2(a).

3.      The defendant has read and fully understands the charges contained in the indictment. He fully understands the nature and elements of the crimes with which

he has been charged, and those charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4. The defendant voluntarily agrees to plead guilty to Counts One, Two, and Nineteen of the second superseding indictment, set forth in full as follows:

*COUNT ONE*

*THE GRAND JURY CHARGES THAT:*

*1. Beginning by at least June 2020, and continuing until on or about November 29, 2022, in the State and Eastern District of Wisconsin and elsewhere,*

*PHILLIP DANIELS, SR., a/k/a "Dr. Phil,"*
*ROY HENTON, a/k/a "Pops,"*
*JOATHAN I. COLULA,*
*JULIO BARRAZA,*
*DEONTE EDWARDS,*
*JIMMY GONZALEZ MACIAS, a/k/a "JIMMY MACIAS,"*
*JAMEEL BRADLEY, SR., a/k/a "Black," a/k/a "Chris,"*
*MICHAEL O. WILLIAMS,*
*JOELLE MASSEY,*
*KEVIN NELSON,*
*RAMONA FRYER,*
*CARLA SMITH, and*
*ITZEL CRUZ GONZALEZ*

*knowingly and intentionally conspired with each other, and with other persons known and unknown to the grand jury, to possess with the intent to distribute and to distribute a mixture and substance containing a detectable amount of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).*

*2. The amount involved in the conspiracy attributable to each defendant as a result of his and her own conduct, and the conduct of other co-conspirators reasonably foreseeable to him and her, is 400 grams or more of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as fentanyl, a Schedule II*

2

controlled substance; 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance; 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance; 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance; and 100 kilograms of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance.

All in violation of Title 21, United States Code, Sections 846, 841(b)(1)(A), and 841(b)(1)(B), and Title 18, United States Code, Section 2(a).

## COUNT TWO

**THE GRAND JURY FURTHER CHARGES THAT:**

From in or about June 2020 through on or around November 29, 2022, in the State and Eastern District of Wisconsin and elsewhere,

**PHILLIP DANIELS, SR., a/k/a "Dr. Phil,"**
**ROY HENTON, a/k/a "Pops,"**
**JOATHAN I. COLULA,**
**DEONTE EDWARDS,**
**JAMEEL BRADLEY, SR., a/k/a "Black," a/k/a "Chris,"**
**JOELLE MASSEY,**
**RAMONA FRYER, and**
**BETTY J. DANIELS**

knowingly combined, conspired, and agreed with each other and with other persons known and unknown to the grand jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, namely, to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, drug trafficking as charged in Count One, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location,

3

*source, ownership, and control of the proceeds of specified unlawful activity, and knowing that the*

*property involved in the financial transactions represented the proceeds of some form of unlawful*

*activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).*

*In violation of Title 18, United States Code, Section 1956(h).*

### <u>COUNT NINETEEN</u>

**THE GRAND JURY FURTHER CHARGES THAT:**

*On or about November 29, 2022, in the State and Eastern District of Wisconsin,*

**JAMEEL BRADLEY, SR., a/k/a "Black," a/k/a "Chris,"**

*knowingly possessed a firearm in furtherance of the drug trafficking offense charged in Count One*

*of this Second Superseding Indictment.*

*In violation of Title 18, United States Code, Section 924(c)(1)(A)(i).*

5.      The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offenses described in paragraph 4. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment A beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt. This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in these offenses.

4

## PENALTIES

6.     The parties understand and agree that the offenses to which the defendant will enter a plea of guilty carry the following maximum penalties:

> Count One: a mandatory minimum of 10 years and up to a lifetime term of imprisonment; a fine of up to $10 million; and at least 5 years and up to a lifetime term of supervised release.

> Count Two: a maximum of 20 years; a fine of up to $500,000; and up to 3 years of supervised release.

> Count Nineteen: a mandatory minimum of 5 years, and up to life imprisonment, which must run consecutive to any other sentence; a fine of up to $250,000; and up to 5 years of supervised release.

Each count also carries a mandatory special assessment of $100.

7.     The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney, including any possibility that the defendant may qualify as a career offender under the sentencing guidelines.

## PROOF OF DRUG WEIGHT FOR STATUTORY MAXIMUM PENALTY

8.     The parties understand and agree that for the penalties in 21 U.S.C. § 841(b)(1)(A) to apply, as provided in paragraph 6 above, the government must prove beyond a reasonable doubt that the offense to which the defendant is pleading guilty involved at least 400 grams or more of a mixture and substance containing N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as fentanyl, a Schedule II controlled substance; 500 grams or more of a mixture and substance containing methamphetamine, a Schedule II controlled substance; 1 kilogram or more of a mixture and substance containing heroin, a Schedule I controlled substance; 5 kilograms or more

5

of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance; or 100 kilograms or more of a mixture and substance containing marijuana, a Schedule I controlled substance. The defendant agrees that the government possesses sufficient, admissible evidence to meet this burden.

## ELEMENTS

9.     The parties understand and agree that in order to sustain the charge of conspiracy to possess with the intent to distribute and distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846, as set forth in the second superseding indictment, the government must prove each of the following propositions beyond a reasonable doubt:

<u>First</u>, the conspiracy, as alleged in the information, existed, and;
<u>Second</u>, the defendant knowingly and intentionally joined the conspiracy with the intention to further the conspiracy.

10.     The parties understand and agree that in order to sustain the charge of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), as set forth in the second superseding indictment, the government must prove each of the following propositions beyond a reasonable doubt:

<u>First</u>, an unlawful agreement to violate Section 1956 existed;
<u>Second</u>, two or more participants were involved;
<u>Third</u>, the defendant joined the conspiracy; and
<u>Fourth</u>, the defendant intended for the conspiracy to succeed.

11.     The parties understand and agree that in order to sustain the charge of possession of a firearm in furtherance of a drug trafficking crime in violation of 18

6

U.S.C. § 924(c), as set forth in the second superseding indictment, the government must prove each of the following propositions beyond a reasonable doubt:

First, the defendant committed a drug trafficking crime; and
Second, the defendant knowingly possessed a firearm in furtherance thereof.

## SENTENCING PROVISIONS

12.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

13.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

14.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offenses set forth in paragraph 4. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

15.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and

7

agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

16.     The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

17.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

18.     The parties agree to recommend to the sentencing court that the relevant conduct attributable to the defendant is at least 3 kilograms of fentanyl, a Schedule II controlled substance; 40 kilograms of cocaine, a Schedule II controlled substance; 9 pounds of methamphetamine, a Schedule II controlled substance; and 207 grams of heroin, a Schedule I controlled substance.

8

## Base Offense Level

19.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count One is 34 under Sentencing Guidelines Manual § 2D1.1(c)(3). The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count Two is 34 under Sentencing Guidelines Manual § 2S1.1(a)(1).

## Specific Offense Characteristics

20.     The government agrees to recommend to the sentencing court that a 2-level increase under Sentencing Guidelines Manual § 2D1.1(b)(12) is applicable to the offense level for the offense charged in Count One because the defendant maintained a premises for the purpose of mafnufacturing or distributing a controlled substance.

21.     The government agrees to recommend to the sentencing court that a 2-level increase under Sentencing Guidelines Manual § 2S1.1(b)(2)(B) is applicable to the offense level for the offense charged in Count Two because the defendant was convicted under 18 U.S.C. § 1956.

## Role in the Offense

22.     The parties agree to recommend to the sentencing court that a 3-level increase under Sentencing Guidelines Manual § 3B1.1 is applicable to the offense charged in Count One because the defendant was an organizer, leader, manager, or supervisor of that criminal activity.

## Acceptance of Responsibility

23.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Career Offender

24.     The parties acknowledge, understand, and agree that the defendant may qualify as a career offender under the sentencing guidelines. The parties further understand, acknowledge, and agree that the defendant may not move to withdraw the guilty plea solely as a result of a determination that under the guidelines, the defendant is determined to be a career offender.

## Sentencing Recommendations

25.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offenses as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

10

26.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

27.     The government agrees to recommend a sentence within the low-end of the applicable sentencing guideline range, as determined by the court.

## Court's Determinations at Sentencing

28.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

29.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

30.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is

11

expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

31.     The defendant agrees to provide to the Financial Litigation Program (FLP) of the United States Attorney's Office, at least 30 days before sentencing, and also upon request of the FLP during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLP and any documentation required by the form.

### Fine

32.     The parties agree to recommend that no fine be imposed.

### Special Assessment

33.     The defendant agrees to pay the special assessment in the amount of $300 prior to or at the time of sentencing.

### Forfeiture

34.     The defendant agrees that approximately $9,010 in United States currency described in paragraph 1, subparagraph d, of the forfeiture notice of the second superseding indictment, constitutes the proceeds of the offenses to which he is pleading guilty or were used to facilitate such offenses. The defendant agrees to the forfeiture of this property and to the immediate entry of a preliminary order of forfeiture. The

12

defendant agrees that he has an interest in each of the listed properties. The parties acknowledge and understand that the government reserves the right to proceed against assets not identified in this agreement.

## DEFENDANT'S COOPERATION

35.     The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so. The parties acknowledge, understand and agree that if the defendant provides substantial assistance to the government in the investigation or prosecution of others, the government, in its discretion, may recommend a downward departure from: (a) the applicable sentencing guideline range; (b) any applicable statutory mandatory minimum; or (c) both. The defendant acknowledges and understands that the court will make its own determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

## DEFENDANT'S WAIVER OF RIGHTS

36.     In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

    a.    If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

13

b.   If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c.   If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d.   At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e.   At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

37.   The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offenses to which the defendant intends to plead guilty.

14

The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

38.     The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

39.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

### Further Civil or Administrative Action

40.     The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

15

## GENERAL MATTERS

41.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

42.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

43.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

44.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offenses on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

45.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final

16

resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

46.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 5/27/2025

JAMEEL BRADLEY, SR.
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: May 27, 2025

MARK S. ROSEN
Attorney for Defendant

For the United States of America:

Date: 5/28/2025

RICHARD G. FROHLING
United States Attorney

Date: 5/28/2025

ELIZABETH M. MONFILS
ERICA J. LOUNSBERRY
Assistant United States Attorneys

18

## ATTACHMENT A

Had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt. These facts are based upon court-authorized Title III interceptions, information provided by law enforcement agents, surveillance, controlled purchases of controlled substances, physical evidence seized, confidential sources, financial records, and other evidence. This information is provided for the purpose of setting forth a factual basis for the defendant's guilty plea. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

## BACKGROUND REGARDING THE DANIELS DTO

In January 2022, members of the North Central High Intensity Drug Trafficking Area (HIDTA), the Drug Enforcement Administration (DEA), Homeland Security Investigations (HSI), and the Internal Revenue Service (IRS) initiated an investigation into individuals distributing large quantities of methamphetamine, heroin, fentanyl, cocaine, and marijuana throughout Milwaukee, Wisconsin, and elsewhere. Law enforcement officers identified the leader of the drug trafficking organization (DTO) as Phillip DANIELS SR., a/k/a "Dr. Phil," who established distribution locations in Milwaukee, Wisconsin; St. Paul/Minneapolis, Minnesota; and Chicago, Illinois.

The investigation resulted in courts authorizing the monitoring of several cellular telephones used by DTO members, including the phones of DANIELS, Jameel BRADLEY, SR., and Roy HENTON.

Interceptions and other evidence revealed that, beginning by at least October 2021, Joathan COLULA and Jimmy GONZALEZ MACIAS, California residents, supplied the DANIELS DTO with methamphetamine, cocaine, and fentanyl. Julio BARRAZA, another California resident, packaged and mailed the controlled substances to the DANIELS DTO using fictitious names. Deonte EDWARDS, also a resident of California, assisted DANIELS in purchasing controlled substances from the California-based sources of supply, used his business account to facilitate the payment of drug proceeds to the DTO's suppliers, and obtained, packaged, and sent controlled substances, including fentanyl, cocaine, and marijuana, to the DANIELS' DTO.

DANIELS was based in Milwaukee, where he operated at least one stash location at 52XX N. Teutonia Avenue. HENTON, also based in Milwaukee, was DANIELS' partner in DTO operations, and he manufactured and distributed controlled substances, frequented the Milwaukee DTO stash location, and retrieved parcels suspected to contain controlled substances. Kevin NELSON and Domonique LEWIS were Milwaukee-based DTO distributors. MASSEY, DANIELS' long-term girlfriend based in Milwaukee, received narcotics-laden parcels, distributed controlled substances, and laundered and facilitated the movement of DTO proceeds. Airline records show that DANIELS,

HENTON, and MASSEY all traveled from Milwaukee or Chicago to California on multiple occasions. Intercepted communications and surveillance reveal that these trips were to procure controlled substances for the DTO.

The DTO distributed methamphetamine, fentanyl, heroin, cocaine and other controlled substances in Minnesota. DANIELS and Michael WILLIAMS worked in partnership to manufacture and distribute controlled substances in the St. Paul/Minneapolis metropolitan area. WILLIAMS and DANIELS operated a stash location in Minneapolis. Ramona FRYER was a Minnesota-based DTO distributor who received narcotics-laden parcels, maintained a storage locker used to store drugs, frequented the Minnesota stash house, and laundered and facilitated the movement of DTO proceeds. Carla SMITH, FRYER's mother, was also a Minnesota-based DTO distributor.

Furthermore, the DTO distributed controlled substances in the greater Chicago, Illinois area. DANIELS and BRADLEY SR. worked in partnership to procure controlled substances, including methamphetamine and cocaine, for the DTO. BRADLEY SR. traveled with DANIELS to California and Memphis, Tennessee to facilitate and supply narcotics to the DTO. Itzel CRUZ GONZALEZ also worked with BRADLEY SR. and DANIELS to procure controlled substances, including methamphetamine, from GONZALEZ MACIAS. CRUZ GONZALEZ also facilitated the DTO by packaging controlled substances and accounting for DTO proceeds. DANIELS and BRADLEY SR. then worked together to distribute controlled substances in and around Chicago.

Court-authorized interceptions, physical and electronic surveillance, and postal records reflect that the DANIELS DTO used United Postal Service (UPS), FedEx, and/or the United States Postal Service (USPS) to ship and receive at least 45 parcels containing controlled substances, to include methamphetamine, fentanyl, cocaine, and marijuana. COLULA, BARRAZA, and EDWARDS sent the drug parcels to DTO-related addresses in Milwaukee, Wisconsin, and St. Paul, Minnesota, using aliases and/or fictious identifying information. During the course of the investigation, two narcotics-laden parcels were lawfully searched, resulting in the seizure of approximately 3 kilograms of cocaine from a package addressed and mailed to FRYER at her home address by BARRAZA in March 2022, and 1 kilogram of fentanyl from a package sent to DANIELS in Milwaukee in November 2022.

Throughout the course of the investigation, DTO members, including HENTON, used various business bank accounts to conceal and disguise the nature and source of their drug proceeds. DANIELS, HENTON, MASSEY, FRYER, and BRADLEY SR. deposited drug proceeds in the form of cash and cashiers' checks into (1) DANIELS' and Betty DANIELS' (B. DANIELS) business account, (2) COLULA's business account, and (3) EDWARDS' business account. DANIELS withdrew currency in the form of cashier's checks from his business accounts, which he then electronically transferred to

2

EDWARDS' business account in the name of Tier One Records, which EDWARDS used as a "funnel" account. After receiving the drug proceeds, EDWARDS withdrew the money and gave it to the DTO's California-based suppliers, to include COLULA and GONZALEZ MACIAS.

The investigation further revealed that DANIELS used various other methods to send drug proceeds to the California-based suppliers. DANIELS used "ghost" bags, sending luggage containing drug proceeds to Los Angeles, California, on flights that he did not board. On one occasion, COLULA was observed picking up a "ghost" bag. On another occasion, a "ghost" bag was lawfully searched, revealing $105,000 in bulk currency. The DTO also used couriers to drive the controlled substances from California to the Midwest at DANIELS' the direction. In January 2022, law enforcement seized approximately 7 kilograms of cocaine from a DTO courier while the courier was traveling from California to Milwaukee at the direction of DANIELS and BRADLEY SR.

On November 29, 2022, case agents executed numerous federal arrest warrants for DTO members and search warrants at DTO-associated locations. The search warrants resulted in the seizure of over 10 kilograms of fentanyl (pressed fentanyl and fentanyl in pill form), approximately 7.5 kilograms of cocaine, more than one kilogram of methamphetamine (crystal methamphetamine and methamphetamine pills), nearly 2 kilograms of heroin, ecstasy, oxycodone, approximately 170 pounds of marijuana, marijuana edibles, over $450,000, and 19 firearms.

## BRADLEY SR.'s DTO INVOLVEMENT

The investigation in this case revealed that BRADLEY SR. procured and distributed methamphetamine, cocaine, and fentanyl for the DTO in the greater Chicago area. Airline records reflect that BRADLEY SR. flew to California, where the DTO sourced many of the drugs it distributed, on multiple occasions in 2020 and 2021 with co-conspirators like DANIELS and HENTON. BRADLEY SR. also found new narcotic suppliers and introduced them to DANIELS. For example, in September 2022, BRADLEY SR. and DANIELS traveled to Memphis, Tennessee, together to meet a new narcotics supplier and obtain narcotics. In 2022, BRADLEY SR. also worked with DANIELS and CRUZ GONZALEZ to obtain controlled substances from GONZALEZ MACIAS and "Gucci," California-based suppliers.

During the investigation of this case, Title III wiretap authorization was obtained for two phones used by BRADLEY SR. Between September 30, 2022, and November 12, 2022, case agents identified approximately 270 intercepted calls and/or text messages between BRADLEY SR. and others that related to his involvement in the DTO. Additional calls between other DTO co-conspirators about BRADLEY SR., combined with physical and electronic surveillance, tracking and interception of packages, and the warrants executed on November 29, 2022, built a comprehensive picture of BRADLEY SR.'s

3

involvement in the DTO. The information that follows was gathered using these methods.

<h2 style="text-align:center">Distribution and Partnership with DANIELS</h2>

On August 24, 2022, at approximately 9:24 p.m., DANIELS called MASSEY and told her he was on his way to their house. He asked MASSEY to come outside with BRADLEY SR., whom he referred to as "Jay." DANIELS instructed MASSEY, "Jay and [U/I] the shit in his car. Take the purple shit out and get in his car." MASSEY confirmed that they would do so and told DANIELS that they may head to BRADLEY SR.'s residence. Based on the investigation, the purple drug DANIELS asked MASSEY to bring with her in BRADLEY SR.'s car was fentanyl, which DANIELS often called "Barney" due to its color.

On August 30, 2022, at approximately 8:55 p.m., BRADLEY SR., called DANIELS, whom location monitoring showed was outside BRADLEY SR.'s residence. BRADLEY SR. asked DANIELS about his assessment of a quantity of cocaine, which he referred to by the common street term "girl." BRADLEY SR. asked, "How you like the look of that bitch, that girl?" DANIELS replied, "Beautiful, A-1," meaning that he liked the quality.

On or about September 21, 2022, at approximately 3:32 p.m., BRADLEY SR. called DANIELS because he (BRADLEY SR.) was trying to facilitate the distribution of a large amount of controlled substances to "Vino" who was repeatedly calling and trying to rush BRADLEY SR. on a delivery of controlled substances. BRADLEY SR. told DANIELS, "Yeah I'm [U/I] waiting on you bro… Vino got that. Yeah, Vino got that, and old boy is like…" DANIELS had not yet added cutting agents to the drugs. He responded, "Okay, let me go—let me go put the… me go put the…" BRADLEY SR. then asked, "So you want me just . . . get [U/I] off of Vino? . . . And you at the house?" BRADLEY SR. also explained that Vino was "blowing him up," meaning calling him repeatedly. DANIELS told BRADLEY SR. that the drugs were not yet ready for Vino, and that if they delivered them as they were, their customers would come to expect a different product than what they could ordinarily provide: "Oh my goodness. I got—he blowing you up, but I mean... No. He can't do that. He can't do that. I mean, is nice to what's-the-name, but somebody going—he going immediately know that, what they come back for is not what we going—that's not going be the same, see? Can't do that." DANIELS further explained that they would not make any money from the transaction if they delivered the pure substances, and that he would try to hurry to get the drugs cut: "And then decide there no money in there for us. And, no money, I ain't with that. I ain't with that. I definitely had that ready in a second and I wasn't coming down to—I wasn't going come down there until about an hour from now. But, I'm a try to get—I'm finna go get that together and get on the road."

As the call went on, BRADLEY SR. asked, "Yeah so, you goin' put that—of that five, gonna turn into two or somethin'?" DANIELS responded, "Um, no-no-no, you can't do that. Can't do that. You can get two out. Can't get no—can't get no what's-the-name without..." BRADLEY SR. replied, "No, I'm talkin' about that five that turned into a whole, I mean. My bad." DANIELS then explained his normal ratio of drugs to cutting agent: "We can, me and you could—I mean, but not... Right, that's what I'm saying. No-no-no, that's why I said, 'You can get—you can an extra two out. You can't get no—a whole what's-the-name and it be the same. When you want to stay the same, you can only get two out'... Follow me?" BRADLEY SR. acknowledged, and DANIELS stated, "Like, Old Boy over there, you can. You get—you listenin' to what I'm saying? What we doin' for Old Boy, we could do that. We could turn 650 to one." BRADLEY SR. stated, "And he still—and he could do the same thing too, huh?" DANIELS stated, "Mm-hum, turn six —yep we turn 650 to one. Anytime, 650 to one, and ain't no— they don't know the difference." BRADLEY SR. said, "Yeah." DANIELS described why he chose that ratio, and the balance of profit and customer satisfaction: "'Cause two—is too powerful. You hear what I'm sayin'? But never, uh, I never do half and half. I always do like 650, 700. I'll just have a hundred to a one. If I get three out of 'em, I'd be good. I don't wanna hurt it. I don't want— Listen: I want you where you can't even— you didn't even know it did anything."

In this call, DANIELS and BRADLEY SR. discussed mixing cutting agents into controlled substances. Specifically DANIELS advised BRADLEY SR. regarding the correct formulas to use, in that DANIELS told BRADLEY SR. that he usually mixes 650 grams or 700 grams of controlled substances with enough cutting agents to make one kilogram of controlled substances. Moreover, DANIELS stated that he does not want to dilute the controlled substances too much, as his goal is to mix just enough cutting agents so that his customers do not even know that any adulterants were added.

That evening, BRADLEY SR. and DANIELS made the delivery to Vino. At approximately 7:23 p.m., BRADLEY SR. called DANIELS and asked, "You enroute?" DANIELS replied, "Yeah." GPS and phone location data for DANIELS showed that DANIELS then traveled from Milwaukee to Northern Illinois, arriving at a White Castle restaurant in Gurnee, Illinois at approximately 8:54 p.m., where he remained for a little over one hour before traveling back to Wisconsin. Surveillance video from the White Castle parking lot showed that about twenty minutes after DANIELS arrived, BRADLEY SR.'s silver Ford Explorer arrived and backed in next to DANIELS' black GMC Yukon. BRADLEY SR. exited the driver's seat of the Explorer and handed a white object to the front passenger of DANIELS' vehicle through the window. Thereafter, DANIELS and J.B. exited the Yukon, and they talked for a few minutes with BRADLEY SR. at the rear of the vehicles. From approximately 9:29 p.m. to 9:58 p.m., DANIELS entered BRADLEY SR.'s vehicle and sat in the driver's seat, conversing with an unknown male who was seated in the front passenger seat. While DANIELS was inside the Explorer, BRADLEY SR. could be seen outside the vehicle talking with another unknown individual. DANIELS then

5

exited BRADLEY SR.'s vehicle and re-entered the black Yukon. BRADLEY JR. also re-entered the Yukon, and they exited the parking lot. BRADLEY SR. entered the Explorer with an unknown male, and they later left the parking lot. At approximately 11:56 p.m., GPS data showed that DANIELS briefly stopped in the area of 52XX North Teutonia Avenue #4, which was a stash house used by the DANIELS DTO, before returning to his residence.

On or about October 1, 2022, at approximately 6:10 p.m., BRADLEY SR., called DANIELS and reported that he had just ordered two kilograms of a controlled substance. He stated, "I just—I just got to talk to Boo." DANIELS asked, "What he say?" BRADLEY replied, "I just talked to him, he said he just got up here." BRADLEY SR. also told DANIELS, "I put a order in for two" and said he was waiting on the supplier to arrive.

Later, at approximately 6:57 p.m., BRADLEY SR. called an unidentified male and stated, "Tell me something." The unidentified male replied, "He talkin' about in the morning." BRADLEY SR. questioned, "In the morning?" The unidentified male affirmed, "Yeah." BRADLEY SR. asked, "What time in the morning?" The unidentified male replied, "I'd say about 10." After hanging up, BRADLEY SR. immediately called DANIELS and said, "Uh, I just talked to—I talked to him. He said tomorrow morning, 10 o'clock. Around 10:00, 11:00." DANIELS replied, "Okay, cool. Sounds great." BRADLEY SR. asked, "So would you be ready? Still be stayin' up here?" DANIELS replied, "Yeah. All right—it look like I have to now. I didn't want to but…" Location information on DANIELS' and BRADLEY SR.'s phones and DANIELS' GMC Yukon, reflected that DANIELS and BRADLEY SR. were in Chicago, Illinois during these calls.

The next morning, October 2, 2022, BRADLEY SR. attempted to call the supplier but was unable to reach him. Meanwhile, while still in Chicago, at about 12:07 p.m., DANIELS called MASSEY and asked her to locate $2,000 in missing money for him. He indicated during the call that he had brought $20,000 to Chicago with him. At approximately 2:18 p.m., BRADLEY SR. called DANIELS and reported, "It was him. We 'posed to got up early and did that. And he fucking—yeah, he fucking… overslept." DANIELS replied, "Got you." BRADLEY SR. continued to impress on DANIELS that the failure was the supplier's and not his: "He was out partying, I guess. I'm like man, bro. I was on point anyway when you call, you hit me this morning. I was already up. And I'm—I been blowing him up." Based on the calls and surveillance, it appears the intended meeting with the supplier never took place.

On or about October 8, 2022, an unidentified male called BRADLEY SR. to complain about $150 worth of cocaine a co-conspirator had sold him on BRADLEY SR.'s behalf. The male stated, "Hey, hold tight my boy. This ain't no good, my boy. I'll just take the bread back, G. Like, I feel like you tryn' a get over on us like we some goofies or somethin'." BRADLEY SR. asked, "How the shit ain't no good? When it's the same good coke I give her all the time? There's nothin' wrong with that coke." The male responded,

6

"He talkin' about the weight. I'm talking 'bout how it appear, though. You take it out the plastic and it ain't nothing but a two point five." BRADLEY SR. replied, "It's more than two point five. My homie just said it was a 3.0. I just got off the phone with him. Said he put a three point on there. I don't play no games." The male then stated, "We–we used the scale [U/I]. It ain't even about that. It's just kinda like the principle, too. You feel me? Black bag, can't see. Y'all tell us it's supposed to be a three-five." BRADLEY SR. then stated, "Look, this is what I'm a do for you. You can have it and I'm a give you your money back. I don't care about no money. That's- that's small to me, bro. I'm a give you your money back and you can have that, bro." The unidentified male responded, "It's, uh, it's—it ain't even about the money." BRADLEY SR. replied, "No, no, no—look! I'm a good business. I'm telling you, I'm a good businessman, so I don't care about that. You can have it, and I'm a give you your bread back. That's nothing to me, bro. I don't have nothing to get over nobody on. I don't have no reason to get over nobody. I'm a busy man. Like, my homie put this together. I said I was gonna make it right. You said you didn't want to make it right. I'll give you your money back, and you can have it. I don't care about that. That's nothing to me, bro." The unidentified male replied that "I hear that [U/I] I don't do no handout, though. You hear me though? So it's, like." BRADLEY SR. interrupted saying "No handout. I f*cked up on my end; I fucked up, and I'm a bless you with it. No problem. I'm a businessman. I don't got reason to get over on nobody for no hundred and fifty dollars. That's not gonna do nothing for me, to get over. I wanna keep your business. I don't wanna push away your business. I don't wanna take your business. I don't wanna take your money from you. I'm not into that." The unidentified male then stated, "Aight." BRADLEY SR. continued, "I'll bring your money back when I come back, bro."

On or about October 12, 2022, at approximately 4:58 p.m., BRADLEY SR. called DANIELS and told him that he and another unknown male were ready to meet to package and prepare controlled substances for distribution. He told DANIELS, "I got ol' boy. He's finna go get a hotel room real quick." He added, "So we can, you know, fool around." During this call, DANIELS's black GMC Yukon was parked in the lot at BRADLEY SR.'s residence in Deer Park, Illinois. While he was on the phone with BRADLEY SR., law enforcement observed DANIELS exit the Yukon, walk to the trunk of the vehicle, and open the hatch. Law enforcement also observed BRADLEY JR. exit the Yukon. DANIELS asked BRADLEY SR. what he should do with the drugs for the time being: "So what do you want me to do? Do you want me to take it out? Do you want me to leave it until we get there? What you wanna do?" BRADLEY SR. replied, "Let's leave it 'til we get there." Later in the conversation, DANIELS stated, "All right. I'm gonna leave everything the way it is then. I'll leave everything like it is." BRADLEY SR. stated, "Um-hum… We'll do one thing at a time. We'll make our way 'round." DANIELS replied, "We'll make our rounds. Okay, got you. That sounds good."

At approximately 5:15 p.m., law enforcement observed BRADLEY SR.'s silver Ford Explorer arrive at his apartment building. DANIELS, BRADLEY SR., and BRADLEY

7

JR. all went into the building. At approximately 6:00 p.m., law enforcement observed DANIELS, BRADLEY SR., BRADLEY JR., and an unknown male exit the apartment building. All four subjects entered the black Yukon and drove to the Miami Inn Motel and Suites, located at 9041 South Cicero Avenue in Oak Lawn, Illinois. Once there, the four men exited the Yukon and went into motel room 37, where they remained for close to two hours. Thereafter, the Yukon made the distribution "rounds" BRADLEY SR. had talked to DANIELS about—approximately eight stops throughout the Chicago area that lasted between nine minutes to one hour and forty-one minutes each. After the last stop, the Yukon returned to Wisconsin.

Based on their knowledge of this investigation, case agents believe that DANIELS brought controlled substances and/or money with him to Illinois, from either Minnesota and/or Milwaukee. Case agents further believe that after the meeting at the hotel, DANIELS and BRADLEY SR. intended to sell the controlled substances and/or intended to make money pickups at different locations throughout Chicago. Based upon the GPS data for the Yukon after it left the hotel, case agents believe that DANIELS and BRADLEY SR. made their "rounds" to drug customers throughout the Chicago area.

On or about October 13, 2022, at approximately 3:34 p.m., video surveillance at DANIELS' stash house on North Teutonia Avenue in Milwaukee showed that DANIELS' black GMC Yukon arrived and parked in the rear parking lot. Law enforcement observed DANIELS and BRADLEY SR. exit the vehicle and enter the building through the front door. At approximately 3:58 p.m., DANIELS and BRADLEY SR. exited the apartment building. Upon exiting, DANIELS was observed wearing latex gloves. Case agents further noticed that the front jacket pockets of both DANIELS and BRADLEY SR. appeared to be full, based on their bulging appearance. While DANIELS was walking, he kept his left arm over what appeared to be a heavy object in his left jacket pocket. DANIELS and BRADLEY SR. entered the GMC Yukon and drove away.

At approximately 4:12 p.m., the Yukon arrived in the 3400 block of North 24th Street in Milwaukee to conduct a narcotics transaction. Law enforcement observed an unknown male exit a red Maserati and enter 34XX North 24th Street. The same unknown male exited the residence a short time later and left the area in the Maserati. Law enforcement believes, based upon their training, experience, and knowledge of this investigation, that a drug transaction occurred. At approximately 5:04 p.m., DANIELS and BRADLEY SR. left North 24th Street in the Yukon and return to the stash house, where DANIELS went inside.

On or about October 27, 2022, at approximately 12:47 p.m., BRADLEY SR. called DANIELS to fill him in about a new supplier's prices. He asked DANIELS, "Guess what they doing?" DANIELS responded, "What?" BRADLEY SR. replied, "Okay, he saying they'll do eight dollars a gram on Pinot, right?" He explained that the supplier preferred to deal in "zip" or gram quantities but would sell at a better price if they bought in bulk:

"But they prefer we do zips. They doing zips at like thirty-five to forty on Gee. On like... I don't know what it is... 35-40 a gram, I believe, on a zip. Per twenty-five." BRADLEY SR. then asked, "Guess what they big on down there?... Smokin' out the foil." DANIELS replied, "Told you." BRADLEY SR. responded, "'It's rocket!,' they say down there, and 'on the Fetty-Wap.' The Fetty, the Fills. And guess how much the zips are that Michael sells?" DANIELS asked, "How much?" BRADLEY SR. exclaimed, "Five to six hundred bucks a zip!"

On or about November 5, 2022, at approximately 2:06 p.m., BRADLEY SR. called an unidentified male and inquired about the price of crystal methamphetamine. He asked, "Eh, how much does a gram of ice go for?" The unidentified male replied, "I don't know. I ain't ever bought none of that stuff." BRADLEY SR. instructed the unidentified male to "ask around."

A few days later, on or about November 10, 2022, at approximately 2:48 p.m., BRADLEY SR. called the same unidentified male and asked, "How much you selling the grams of ice for?" He also asked, "You sellin' more ice?" The unidentified male told BRADLEY SR. he charged "like forty bucks—forty a pop." BRADLEY SR. instructed him, "Now we're doing fifty a pop."

## Memphis Trip to Procure Controlled Substances

Beginning around August 31, 2022, DANIELS and BRADLEY SR. began planning a trip to Memphis to establish a new source of supply for controlled substances. On September 1, 2022, at approximately 10:23 a.m., BRADLEY SR. called DANIELS to confirm they would leave for Memphis the following day. Later in the conversation, DANIELS indicated they would not purchase a large quantity of controlled substances from the supplier in Memphis during that trip because he could not get enough money together in time, and that instead they would travel to Memphis to inspect the product. Later in the conversation, BRADLEY SR. told DANIELS that he had "put visual on" the product the day before, to which, after additional conversation, DANIELS responded, "Dang! I ain't look at it, you know what I mean? 'Cause too many people was around, so." Later in the call, DANIELS and BRADLEY SR. discussed in coded language how they would operate once they secured a connection with this supplier, including how they planned to purchase ten kilograms of a controlled substance at once that would be resold to ten distributors. DANIELS stated, "You buy ten of those, ten of 'em," before explaining, "I got you, boom boo. We gonna tell you [U/I]. You fly in, you see, you fly back down and gonna meet you where you are." BRADLEY SR. replied, "Yup, that's true; that's right, wooo." DANIELS then said, "Here's the fee, here is the cost. Here is the monthly—here is the monthly charge. Now we got a monthly fee covered on all ten of 'em. Ten different bosses."

9

The next day, September 2, 2022, court-authorized location data for DANIELS' black GMC Yukon and cellular phone reflected that DANIELS had left his residence in Milwaukee at approximately 5:00 p.m. and arrived at the BRADLEY SR.'s residence in Illinois at approximately 8:03 p.m. According to physical surveillance, DANIELS went inside the residence, and both DANIELS and BRADLEY SR. exited together at approximately 10:45 p.m., with BRADLEY SR. leaving the area driving his silver Ford Explorer and DANIELS driving his black GMC Yukon.

A few hours later, on September 3, 2022, at approximately 12:59 a.m., DANIELS and BRADLEY SR. had a telephone conversation during which they spoke about seeing law enforcement on the freeway and that they had to slow down and use cruise control, likely because they were traveling with a large amount of U.S. currency or illegal contraband in the vehicle.

Later that morning, at approximately 7:43 a.m., DANIELS and BRADLEY SR. arrived at 36XX Allandale Lane in Memphis, Tennessee and entered that residence. At approximately 11:59 a.m., BRADLEY SR. was observed exiting that residence and entering the driver's seat of DANIELS' vehicle, which he parked in front of another residence. At approximately 12:18 p.m., BRADLEY SR. exited the Fox Meadows residence with an unidentified male and drove DANIELS' vehicle to a Walmart on Winchester Road in Memphis. Physical surveillance observed BRADLEY SR. at the money service counter located inside the Walmart, where he called DANIELS to discuss reconvening. During this conversation, BRADLEY SR. explained, "I'm at Walmart right now, [U/I] send some money." He also told DANIELS he was "finna grab this machine," which he later described using the words "the bullet" and "magic." Based on other similar intercepts during this investigation, it appears BRADLEY SR. intended to buy a Magic Bullet food blender to use for mixing controlled substances with adulterants.

After leaving Walmart, BRADLEY SR. and the unidentified male returned to the Fox Meadows Road residence, where they went inside and remained until approximately 2:11 p.m. BRADLEY SR. then entered DANIELS' vehicle again and drove in a manner that made it appear that he was trying to determine whether he was being followed, including making numerous turns and U-turns, and driving through parking lots. At approximately 5:04 p.m., BRADLEY SR. called DANIELS. During their call, DANIELS told BRADLEY SR. that DANIELS was at Bed, Bath, and Beyond, explaining, "I'll be right back, soon as I grab this here, uh, this magic stick," in apparent reference to another blender. BRADLEY SR. later asked DANIELS about whether they should get an unspecified quantity of heroin, which he referred to using the slang term "boy," saying, "Should we go get old boy? Or we goin' [U/I] these down?" DANIELS replied, "Y'all can go get him. Y'all… that'll kill time, 'cause when I get back there, you knowin' I'm a do what I do."

## GONZALEZ-MACIAS and "Gucci"

Based upon intercepted calls, surveillance, and physical seizure of a kilogram of fentanyl, GONALEZ MACIAS was a supplier of multiple controlled substances to the DANIELS DTO, including methamphetamine, cocaine, and fentanyl GONZALEZ MACIAS beginning by at least the fall of 2022. BRADLEY SR. and CRUZ GONZALEZ had some of the earliest known contacts between the DTO and GONZALEZ MACIAS. In total, between July 20, 2022, and November 11, 2022, GONZALEZ MACIAS had approximately 71 contacts with numbers known or believed to be used by BRADLEY SR. Based on the intercepted calls detailed below, agents believe that GONZALEZ-MACIAS and "Gucci" were criminal associates.

On September 30, 2022, at 4:21 p.m., BRADLEY SR. called CRUZ GONZALEZ to alert her that drugs from one of their sources of supply were ready. He told her, "You can go pick yo 'shoes' up; he waitin' on you." CRUZ GONZALEZ replied, "Send over the address." BRADLEY SR. then said, "I just—I already did. Look at your phone." CRUZ GONZALEZ said, "Umm... Yeah... that, that's the, uhh, number you can send it to." BRADLEY SR. said, "What is the number again?" CRUZ GONZALEZ gave BRADLEY SR. a phone number with a 562 (Long Beach/Fullerton, California) area code. CRUZ GONZALEZ also said, "Yeah, it was Angel Tapia house." BRADLEY SR. replied, "Angel Tapia, yep. Los Angeles, right?" CRUZ GONZALEZ then transitioned to talking about a kilogram-quantity drug deal she was working on with a supplier whom she called "Gucci." She told BRADLEY SR., "Let me call you back, 'cause I'm about to call, Gucci had just called me right now. Imma talk to him about that other stuff." She added, "I'll call you back right now. Let me see [U/I] 'cause he told me that they got a thousand." BRADLEY SR. seemed excited by this news and replied, "Hell yea! Get that! That's what we want! Call me back!" CRUZ GONZALEZ explained, "Yeah, but it's more expensive." BRADLEY SR. said, "I don't give a fuck! See what he wants for the thousand!" CRUZ GONZALEZ agreed.

On October 7, 2022, CRUZ GONZALEZ and BRADLEY SR. had several intercepted calls with one another and with third parties about a delivery of five pounds of methamphetamine that they found to be of poor quality. BRADLEY SR. complained to CRUZ GONZALEZ, "All five of 'em, bogus as hell. All them black; it's all of 'em black. And all of 'em is shake. All of it shake..." During this call, CRUZ GONZALEZ indicated she was communicating this to the supplier: "I'm telling him that shit right now." BRADLEY SR. questioned, "Like, how we gonna do this? He'll give us our money back?" Shortly after this call, phone toll records reflect that CRUZ GONZALEZ had three phone contacts in under an hour with GONZALEZ MACIAS.

BRADLEY SR. followed up on this conversation with CRUZ GONZALEZ while DANIELS was in California on November 7, 2022. That night at 9:47 p.m., BRADLEY SR., called CRUZ GONZALEZ and told her, "Gucci said he give me no five motha fucking,

uh, them five he owe me to my brother. He out there." CRUZ GONZALEZ replied, "To give you five of the work?" BRADLEY SR. responded, "What he owe me! Five, five pounds!" CRUZ GONZALEZ stated, "Okay, let me see if I can get ahold of it. Hold of him, okay?" BRADLEY SR. replied, "Say my brother's out there right now." CRUZ GONZALEZ tried to explain to BRADLEY SR. that the quality may not be any better than the last time: "He was, he was telling me, he was just telling me about on Saturday. He was like, 'I got work.' But it's the same, like... Let me just talk to him." BRADLEY SR. replied, "I want no bull. I don't want that same shit." CRUZ GONZALEZ agreed, "I know, that's what I'm telling you. He has that bullshit again and that's what I told him. They don't want that. If that's what you got, then send the money." BRADLEY SR. reiterated, "Yup, my brother out there right now." CRUZ GONZALEZ suggested, "But, if he's over there, he can go check it out." Then she said, "So, let me, let me. Fuck man. Let me try and get ahold of this stupid ass." BRADLEY SR. replied, "Yes, indeed." CRUZ GONZALEZ continued, "Yeah, 'cause he not picking up or nothing, babe." BRADLEY SR. said, "All right. Try and get ahold of him."

Between November 7 and 11, 2022, DANIELS traveled to California on behalf of the DTO. During this trip, DANIELS met with GONZALEZ MACIAS to procure controlled substances, and he also sent EDWARDS to GONZALEZ MACIAS' house to provide payment and obtain controlled substances. During roughly the same period, between November 8, 2022, and November 12, 2022, case agents identified approximately 15 intercepted calls between MACIAS and BRADLEY SR. that related to the DTO.

Location information on DANIELS' phone shows that he traveled to GONZALEZ MACIAS' residence one day later, on November 8, 2022, and stayed for almost three hours. On November 9, at approximately 10:36 p.m., GONZALEZ MACIAS called BRADLEY SR. During this call, BRADLEY SR. discussed GONZALEZ MACIAS' meeting with DANIELS, saying, "You met my brother last night." GONZALEZ MACIAS responded, "Yep." BRADLEY SR. replied, "He like you, so we are gonna be doing more business with you."

Thereafter, shortly before DANIELS returned to Milwaukee, law enforcement intercepted and lawfully searched a package containing a little over one kilogram of fentanyl, which was supplied by GONZALEZ MACIAS. The drugs were packaged in brick form and bore a "Playboy Bunny" logo in the center as a stamp or signature. Surveillance video showed that DANIELS and EDWARDS shipped the parcel on November 11, 2022, from the Postal Annex in Van Nuys, California, and it was addressed to a DTO-related residence in Milwaukee. The package was intercepted and searched pursuant to a search warrant, and it was found to contain 1019.7 grams of fentanyl.

Meanwhile, BRADLEY SR. continued to conduct DTO business in Illinois. On or about November 7, 2022, at approximately 12:45 p.m., BRADLEY SR. called CRUZ GONZALEZ and said he was on his way home. Law enforcement conducted physical

12

surveillance and observed BRADLEY SR.'s SUV parked at his apartment building. A short time later law enforcement observed BRADLEY SR. exit the building and enter his vehicle. At approximately 2:03 p.m., an unidentified male who was waiting to buy drugs from BRADLEY SR. called BRADLEY SR.'s phone. On the intercepted call, BRADLEY SR. explained that he was on his way to the unidentified male's location. The unidentified male responded, "Come on, G, you had me sitting in the hood, all this money, folks." BRADLEY SR. replied, "Money? Oh, shit! You got—you got all of it?" Law enforcement followed BRADLEY SR. to 56XX South Ada Street in Chicago (believed to be supplied and run by BRADLEY SR.), which they knew from prior investigations to be an open-air drug market, and where other officers were already conducting surveillance. Once BRADLEY SR. arrived at the residence, law enforcement observed an uptick in foot traffic indicative of controlled substance trafficking. They saw numerous individuals walk into the front of the residence with U.S. currency in their hands and then walk out seconds later. One of the males who exited the residence pulled out a small paper fold of the type typically used to wrap controlled substances from his pocket.

On or about November 8, 2022, at approximately 1:08 p.m., BRADLEY SR. called CRUZ GONZALEZ and talked with her about money. He told her, "It's four thousand." CRUZ GONZALEZ responded, "The big stack is five thousand." BRADLEY SR. questioned, "All together? And the other one together is five thousand?" CRUZ GONZALEZ responded, "And then the other one is gonna add up five thousand, yeah." CRUZ GONZALEZ further explained, "I put it back, I just put it back to how they were. It's five and five. I just put it back how it was. I know, the stacks are weird."

Later that day, at approximately 4:52 p.m., BRADLEY SR. called CRUZ GONZALEZ and asked her to package cocaine for distribution for him at their residence. BRADLEY SR. asked. "Can you assemble that C, the powder? A lil bag, the sample I had? I think it's in the [U/I] I be keeping it at." CRUZ GONZALEZ clarified, "The one where your drawers are at? Or where you put…" BRADLEY SR. responded, "Yeah, the top one, the top drawer. It's inside the hat. See you—where the grey… It's like a bag with a grey, taped up with some shit? There's a lil' sample bag in the side of it too." CRUZ GONZALEZ replied, "Oh, yeah, it's right here."

<u>Searches</u>

In February 2022, a DTO associate of BRADLEY SR., A.C., accepted a package at A.C.'s residence in Chicago, Illinois (xxxx South Aberdeen Street), which contained approximately 4 pounds of crystal methamphetamine and 5 automatic rifles, all of which were destined for BRADLEY SR. and DANIELS. The methamphetamine in this parcel was supplied by GONZALEZ MACIAS.

On November 29, 2022, BRADLEY SR.'s and CRUZ GONZALEZ's residence located at 10XX Des Plaines Avenue #XXX in Forest Park, Illinois was searched pursuant

13

to a federal search warrant. In the master bedroom, agents located two dressers. Inside of the top drawer of the dresser located along the north wall of the room, agents located $9,010 in U.S. currency; a Glock 22 .40 caliber pistol that was reported as stolen in Memphis, TN, that had one round in the chamber and eleven rounds in the magazine (Serial# GBA611); a heat sealed package containing 207.9 grams of heroin; and a plastic baggie containing 1.6 grams of cocaine. In the top drawer of the dresser located on the west wall of the room, agents found a plastic baggie containing a dozen gem packs, each of which had roughly half a gram of fentanyl inside, for a total of 9.678 grams of fentanyl. A purse with identifiers for CRUZ GONZALEZ was located on top of the west dresser. The middle drawer of the west dresser contained Citi Bank records addressed to CRUZ GONZALEZ.

## SOURCE INFORMATION REGARDING BRADLEY SR.'s DTO INVOLVEMENT

### SOI 1

SOI 1 was a distributor for the DANIELS DTO in Minnesota. SOI 1 recalled that DANIELS ran the DTO with two other men whom DANIELS would refer to as his brothers, one of whom was BRADLEY SR. SOI 1 never met BRADLEY SR., however SOI 1 saw BRADLEY SR. on FaceTime video calls. SOI 1 explained that BRADLEY SR. was involved in the DTO in the same ways that he was: receiving large quantities of drugs, repackaging them into smaller, personal use quantities, selling them, and returning the profits to DANIELS. SOI 1 indicated that prior to SOI's arrest in February 2021, SOI 1 was in communications with BRADLEY SR. and DANIELS about trying to open a shop in Indianapolis, Indiana to sell methamphetamine

### SOI 2

On or about January 16, 2022, a traffic stop was conducted on a black Nissan Altima driven by SOI 2 near Summer, Utah. A drug detection dog alerted to the presence of narcotics in the trunk of the car, and SOI 2's vehicle was searched. The search revealed a white plastic container with a screw off lid containing seven brick-shaped objects, which tested positive for approximately seven kilograms of cocaine.

In a post-arrest, *Mirandized* interview, SOI 2 stated that the car was rented by BRADLEY SR., which was subsequently confirmed from surveillance video and documents related to the vehicle rental. SOI 2 stated that they were driving the black Nissan first to Chicago, and then to Milwaukee, where SOI 2 would be staying with MASSEY. SOI 2's phone was searched pursuant to SOI 2's consent. Located in SOI 2's phone was a text message from DANIELS dated January 12, 2022, which read " . . . this Dr. Phil Please give me a call."

SOI 2 later provided additional statements to law enforcement, including describing how SOI 2 had transported drugs from California to Wisconsin approximately four or five times at the direction of DANIELS and BRADLEY SR. On the first of these occasions, which occurred in approximately July 2021, SOI 2 delivered a washing machine to BRADLEY SR. and DANIELS at a Marriott hotel in Los Angeles, California. SOI 2 watched BRADLEY SR. and DANIELS taking apart the washing machine inside a hotel room. BRADLEY SR. told SOI 2 that they were putting marijuana in the washing machine. While SOI 2 did observe an approximate 3-gallon size bag full of marijuana being placed into the washing machine, SOI 2 also saw them place five to ten rectangular, kilo-sized packages wrapped in aluminum foil and tape in the washing machine. Thereafter, BRADLEY SR. and DANIELS loaded the washing machine onto a Dodge pick-up truck. BRADLEY SR., SOI 2, and SOI 2's friend then drove the Dodge pick-up truck to Milwaukee to meet with DANIELS's son, C.D. Once there, the washing machine was unloaded.

SOI 2's subsequent trips were similar, with BRADLEY SR. instructing SOI 2 to buy other large furniture or household items that were used to conceal drugs during cross-country trips. SOI 2 further stated that DANIELS directed SOI 2 to obtain items commonly used by the DTO when packaging drugs in a manner designed to conceal them from detection, such as cleaning supplies, wipes, hand sanitizer, glue, and expandable foam.

### BRADLEY SR.'s POSSESSION OF FIREARMS IN FURTHERANCE OF DRUG TRAFFICKING

Just a few weeks before a loaded a Glock 22 .40 caliber pistol was seized from BRADLEY SR.'s residence, BRADLEY SR. was intercepted speaking with others over the phone about firearms. On or about November 9, 2022, at approximately 12:37 p.m., BRADLEY SR. called an unidentified male ("UM1") and inquired about his ability to obtain an unidentified controlled substance, asking him, "You can get it?" UM1 replied, "Yeah, I can get it." BRADLEY SR. asked, "How much is it?" UM1 responded, "I gotta call. Let me call and check, 'cause they've been splitting paper and shit. Let me call 'em and check." After additional conversation, BRADLEY SR. told UM1, "I need some guns too. You got some guns?" UM1 replied, "Yeah, I got a lot, I got a lot of that shit. You hear?"

The same day, at approximately 12:38 p.m., BRADLEY SR called two other unknown males ("UM2" and "UM3") and joined them in a single call. During this call, UM1 and BRADLEY SR. asked to purchase firearms, which BRADLEY SR. referred to as "pipes," from UM2. When UM2 seemed confused, BRADLEY SR told him, "Guns, bro." After additional conversation, UM2 stated, "All right, I'm gonna call my n**** in a few seconds and see if he got it. But, uh… another white dude can get it, but he [U/I] on the phone." BRADLEY SR and UM1 began to pressure UM2 into calling his firearm

15

connection. Later in the conversation, BRADLEY SR exclaimed, "I need a mothefuck—I need a Glock thirty. I want a big ass gun, though."

On or about November 12, 2022, at approximately 11:13 a.m., UM2 called BRADLEY SR. while location data showed BRADLEY SR. was at home. During the conversation, CRUZ GONZALEZ could be heard in the background recounting an earlier altercation with others. During the conversation, BRADLEY SR. appeared to reference having a gun and almost shooting someone during the altercation, stating, "I almost popped a hoe. Oh my God, I just cocked that bitch back."

## MONEY LAUNDERING

Several of BRADLEY SR.'s codefendants, including DANIELS and HENTON, and Lenard MONROE operated companies that falsely billed Wisconsin Medicaid for supportive and personal care services. The evidence gathered during this investigation shows that in most instances, the services that were billed to and paid by Wisconsin Medicaid were not actually rendered. Instead, DANIELS and HENTON, using First Response Supportive Care (FRSC) and/or A Touch of Love (ATOL), collectively rented various property units and offered reduced-rate housing, which they provided to individuals in exchange for obtaining their Medicaid information to bill the State of Wisconsin Medicaid for services that were never provided. In some instances, DANIELS and HENTON also offered "stipends" in the form of "payroll" to individuals that were signed up for supportive cares. DANIELS and HENTON coached members to feign limitations in activities of daily living to increase the hours that could be billed to Medicaid.

These purported healthcare businesses were also created and run, in part, to launder money from the DTO. The DTO used ATOL, FRSC, and other business bank accounts to funnel and disguise the source of drug proceeds. Case agents subpoenaed and examined bank records for the period between January 2018 and May 2022 for DANIELS, B. DANIELS, HENTON and their supportive cares agencies. Although these accounts were set up as business bank accounts and collectively received well over $1,500,000 in Medicaid payments, records for these accounts reflected minimal legitimate business expenses and no payroll services during that period. Instead, the accounts all showed patterns of unexplained cash deposits and large cash withdrawals uncharacteristic of a legitimate healthcare business. These accounts also were drawn upon to transfer money to known DTO suppliers and distributors. For example, on December 14, 2021, a $32,900 check from ATOL was deposited into BRADLEY SR.'s Chase Bank account ending in x1778. BRADLEY SR. withdrew $13,000 in cash from that account on February 14, 2021. During the period described above, the accounts collectively received approximately two million dollars in unexplained cash, while withdrawals totaled over $2,700,000.

The DTO also used other purported business accounts to launder money. Among them were two Chase Bank accounts in the name of "Intelligent Investments." DANIELS and HENTON opened this first of these accounts, ending in x2062, on October 16, 2020. Between approximately December 2020 and December 2021, the account ending in x2062 received approximately $99,000 in cash deposits. The majority of that money was used for purposes having no relation to the purported healthcare During this time, the account was used to make approximately $35,000 in payments to American Airlines and approximately $17,000 in payments to hotels. Additionally, $30,000 was withdrawn in cash from this account.

On March 31, 2022, DANIELS and HENTON opened the second Intelligent Investments account, ending in x8205. The signature card lists HENTON listed as the "President" and DANIELS as "Acting Secretary." In October 2022, DANIELS made at least three cash deposits totaling approximately $94,000 into this account.

Financial analysis of the Intelligent Investments bank accounts reflects that they did not operate as any type of legitimate business. Instead, these accounts were used to disguise the nature and origin of DTO proceeds. For example, in addition to the activities described above, at least three checks from Intelligent Investments, in the amounts of $15,000 (August 19, 2022), $17,750 (August 27, 2022), and $17,750 (September 8, 2022), were made out to DTO middleman EDWARDS and deposited into his Chase Bank account under the name "Tier One Records."

On November 8, 2022, BRADLEY SR. obtained two cashier's checks, each in the amount of $5,000, made out to Intelligent Investments, from two different banks (Citibank and Chase). Jameel BRADLEY SR. is listed as the remitter of both checks, and both checks were deposited into DANIELS' and HENTON's Intelligent Investment accounts at Chase that same day. At the time these checks were obtained and deposited, DANIELS was in California meeting with GONZALEZ MACIAS, as discussed above. During and as a result of these meetings, DANIELS and the DTO received large quantities of narcotics, including the kilogram of fentanyl that was seized en route from Van Nuys, California to Milwaukee, Wisconsin.

## CONCLUSION

BRADLEY SR. now admits that he is responsible for the distribution of at least 3 kilograms of fentanyl, 40 kilograms of cocaine, 9 pounds of methamphetamine, and 207 grams of heroin, because these amounts were reasonably foreseeable to him. BRADLEY SR. further admits that he possessed the firearms found in his home on November 29, 2022, in furtherance of his drug trafficking activities. BRADLEY SR. also admits that he was involved in the use of various bank accounts to conceal and disguise the nature of source of the DTO's drug proceeds.