UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

               Plaintiff,

    v.                                        Case No. 22-CR-26

PHILLIP DANIELS, SR., a/k/a "Dr. Phil",

               Defendant.

## PLEA AGREEMENT

1.      The United States of America, by its attorneys, Richard G. Frohling, Acting United States Attorney for the Eastern District of Wisconsin, and Elizabeth M. Monfils and Erica J. Lounsberry, Assistant United States Attorneys, and the defendant, Phillip Daniels, Sr., individually and by attorney Craig S. Powell, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### <u>CHARGES</u>

2.      The defendant has been charged in 19 counts of a 33-count second superseding indictment with violations of Title 21, United States Code, Sections 841(b)(1)(A), 841(b)(1)(B), 841(b)(1)(D), and 846; Title 18, United States Code, Sections 1956(h), 924(c)(1)(A)(i), 1347, and 2(a), and Title 42, United States Code, Section 1320a-7b(b)(2)(A).

3.      The defendant has read and fully understands the charges contained in the indictment. He fully understands the nature and elements of the crimes with which

he has been charged, and those charges and the terms and conditions of the plea

agreement have been fully explained to him by his attorney.

4.      The defendant voluntarily agrees to plead guilty to Counts One, Two, Ten

and Twenty-Five of the second superseding indictment, set forth in full as follows:

<u>*COUNT ONE*</u>

*THE GRAND JURY CHARGES THAT:*

*1.      Beginning by at least June 2020, and continuing until on or about November 29,*

*2022, in the State and Eastern District of Wisconsin and elsewhere,*

> *PHILLIP DANIELS, SR., a/k/a "Dr. Phil,"*
> *ROY HENTON, a/k/a "Pops,"*
> *JOATHAN I. COLULA,*
> *JULIO BARRAZA,*
> *DEONTE EDWARDS,*
> *JIMMY GONZALEZ MACIAS, a/k/a "JIMMY MACIAS,"*
> *JAMEEL BRADLEY, SR., a/k/a "Black," a/k/a "Chris,"*
> *MICHAEL O. WILLIAMS,*
> *JOELLE MASSEY,*
> *KEVIN NELSON,*
> *RAMONA FRYER,*
> *CARLA SMITH, and*
> *ITZEL CRUZ GONZALEZ*

*knowingly and intentionally conspired with each other, and with other persons known and*

*unknown to the grand jury, to possess with the intent to distribute and to distribute a mixture*

*and substance containing a detectable amount of controlled substances, in violation of Title 21,*

*United States Code, Section 841(a)(1).*

*2.      The amount involved in the conspiracy attributable to each defendant as a result of*

*his and her own conduct, and the conduct of other co-conspirators reasonably foreseeable to him*

*and her, is 400 grams or more of a mixture and substance containing a detectable amount of N-*

*phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as fentanyl, a Schedule II*

2

controlled substance; 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance; 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance; 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance; and 100 kilograms of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance.

All in violation of Title 21, United States Code, Sections 846, 841(b)(1)(A), and 841(b)(1)(B), and Title 18, United States Code, Section 2(a).

## COUNT TWO

**THE GRAND JURY FURTHER CHARGES THAT:**

From in or about June 2020 through on or around November 29, 2022, in the State and Eastern District of Wisconsin and elsewhere,

**PHILLIP DANIELS, SR., a/k/a "Dr. Phil,"
ROY HENTON, a/k/a "Pops,"
JOATHAN I. COLULA,
DEONTE EDWARDS,
JAMEEL BRADLEY, SR., a/k/a "Black," a/k/a "Chris,"
JOELLE MASSEY,
RAMONA FRYER, and
BETTY J. DANIELS**

knowingly combined, conspired, and agreed with each other and with other persons known and unknown to the grand jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, namely, to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, drug trafficking as charged in Count One, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location,

3

*source, ownership, and control of the proceeds of specified unlawful activity, and knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).*

*In violation of Title 18, United States Code, Section 1956(h).*

## COUNT TEN

**THE GRAND JURY FURTHER CHARGES THAT:**

*On or about November 29, 2022, in the State and Eastern District of Wisconsin,*

**PHILLIP DANIELS, SR., a/k/a "Dr. Phil,"**

*knowingly possessed at least one firearm in furtherance of the drug trafficking offense charged in Counts One and Nine of this Second Superseding Indictment.*

*In violation of Title 18, United States Code, Section 924(c)(1)(A)(i).*

## COUNT TWENTY-FIVE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.       *At all times material to this indictment:*

    a.       *Defendant ROY HENTON owned and operated A Touch of Love Supportive Care Agency (ATOL).*

    b.       *Defendant PHILLIP DANIELS operated First Response Supportive Care (FRSC) and assisted in operations of ATOL.*

    c.       *Defendant LENARD MONROE owned and operated Wellness Personal Care Service (WPCS).*

4

d.      ATOL and FRSC were Supportive Home Care (SHC) agencies that billed for services purportedly provided to adults with disabilities and elderly people in Milwaukee, Wisconsin.

e.      WPCS was a Personal Care Agency (PCA) that billed Wisconsin Medicaid for services purportedly provided to adults with disabilities and elderly people in Milwaukee, Wisconsin.

*The Wisconsin Medicaid Program*

f.      Medicaid was a program jointly funded by the federal government and participating states to provide health insurance to indigent families with dependent children and to aged, blind, and disabled individuals whose income and resources are insufficient to meet the cost of medical services. 42 U.S.C. §§ 1396, et seq. (the "Medicaid Act").

g.      Wisconsin participates in the Medicaid program ("Wisconsin Medicaid"). In Wisconsin, the Medicaid program was established pursuant to Wisconsin Statutes Chapter 49 and its administrative regulations. The United States pays for a portion of the program. The Wisconsin Department of Health Services (DHS) administers the Wisconsin Medicaid program on behalf of the state and federal government.

h.      DHS operates a Personal Care Agency (PCA) program through Medicaid. A PCA is a home health agency, county department, independent living center, American Indian tribe or band, or a freestanding PCA that provides services that are (1) medically-oriented activities related to assisting an individual with activities of daily living necessary to maintain the individual in his or her place of residence in the community; (2) provided upon written orders of a physician by a certified personal care provider; and (3) provided by a personal care worker (PCW), employed by the provider and under contract to the provider, who is supervised by a

5

registered nurse according to a written plan of care.

i.      A PCA can submit claims to Wisconsin Medicaid for payment via the ForwardHealth Portal ("the portal") using direct data entry (DDE). The PCA requests secure access to the portal and, using the login associated with their provider IDs, completes required fields in the portal, including member ID, date of service, procedure code, number of units, charge amount, and place of service. The PCA may only submit claims after the services have been provided, and the PCA is responsible for the accuracy of the claims submitted via the portal. Medicaid remits payments to the PCA based on the approved claims.

j.      To participate in the Medicaid program, a PCA provider must enter into a written Medicaid Provider Agreement (the "Provider Agreement") with the Wisconsin Department of Health Services in which the provider certifies that every claim submitted is truthful and that the services billed have been furnished in accordance with state and federal law. The Provider Agreement also requires a certification that the provider has not offered, paid, or received anything of value in return for the referral or provision of Medicaid-covered services.

k.      The IRIS program (Include, Respect, I Self-Direct) is a Medicaid Home and Community-Based Services (HCBS) waiver program authorized under § 1915(c) of the Social Security Act and approved by the Centers for Medicare and Medicaid Services (CMS). IRIS is a self-directed program for adults with disabilities and elderly people in Wisconsin. To be eligible for the IRIS program, one must be eligible for Medicaid, need the same level of care as someone in a nursing home, and live in a home, apartment, adult family home, or residential care apartment complex. IRIS participants receive a budget for a range of goods, support, and services, including SHC.

6

l.     A SHC agency must have a valid Medicaid provider's agreement to provide SHC services under the umbrella of the IRIS program and must employ direct-care workers.

m.     A SHC agency submits SHC claims directly to the participant's Fiscal Employer Agency (FEA) monthly using an IRIS provider invoice, which includes the SHC agency information, the participant's information, dates of service, service codes, units, unit rate, unit type, and the total dollar amount. The FEA adjudicates claims based on the participant's approved authorization. If the claims are authorized, the FEA will submit the claims to DHS for funding. DHS will then fund a zero-balance state-held bank account. The SHC agency then receives reimbursement for the claim through an electronic funds transfer.

n.     To participate in the home and community-based waiver services under Wisconsin's Medicaid program, a SHC agency must enter into a written Wisconsin Medicaid Program Provider Agreement with the Wisconsin Department of Health Services in which the provider agrees to comply with all applicable federal and state laws, regulations, and policies relating to providing home and community-based waiver services under Wisconsin's Medicaid program and to provide only the items or services authorized by the managed care organization or IRIS program.

### *The Scheme*

2.     Beginning by at least August 25, 2018, and continuing through November 29, 2022, in the State and Eastern District of Wisconsin and elsewhere,

**PHILLIP DANIELS, SR., a/k/a "Dr. Phil,"**
**ROY HENTON, a/k/a "Pops,"**
**JOELLE MASSEY, and**
**LENARD MONROE**

7

*knowingly and willfully executed and attempted to execute a scheme to defraud a health care benefit program, namely Wisconsin Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of such program, in connection with the delivery of and payment for health care benefits, items, and services.*

3. *DANIELS, HENTON, MASSEY, and MONROE executed the scheme in the following ways:*

a. *DANIELS and HENTON advertised and provided housing to individuals who qualified for Medicaid services. In some instances, MONROE referred individuals to DANIELS and HENTON for housing services.*

b. *DANIELS and HENTON controlled various rental units in Milwaukee, Wisconsin.*

c. *DANIELS and HENTON offered discounted rent and paid stipends to individuals who were signed up for supportive care service with their entities, ATOL and FRSC.*

d. *DANIELS and HENTON recruited individuals who MONROE billed for Medicaid-covered services through WPCS. MONROE paid FRSC for these referrals and to maintain the individuals as members and participants of WPCS and ATOL.*

e. *DANIELS and HENTON coached Medicaid members to feign limitations in their activities of daily living to increase the hours that could be billed to Medicaid.*

f. *MASSEY purported to serve as a PCW for WPCS. MASSEY, MONROE, DANIELS, and HENTON also used stock, template timesheets to memorialize the purported care being provided. As a result, MASSEY, MONROE, DANIELS, and HENTON knowingly*

submitted and caused to be submitted timesheets that misstated the duration, frequency, date, and nature of the services provided, as well as the number of miles claimed.

g. DANIELS, HENTON, MASSEY, and other individuals they directed and controlled, knowingly submitted and caused to be submitted Provider Claim Forms that misstated the date, frequency, and duration of services provided.

h. DANIELS, HENTON, MASSEY, and MONROE, and other individuals they directed and controlled, submitted claims for payment to Medicaid based on those false and fraudulent statements.

4. DANIELS and HENTON submitted and caused to be submitted bills totaling over $600,000, which contained false and fraudulent statements, and which caused Wisconsin Medicaid to pay them over $574,000 to which they were not entitled.

5. DANIELS and HENTON used bank accounts in the names of FRSC and ATOL to receive cash deposits in addition to the above-noted Medicaid payments. More specifically, between January 2018 and May 2022, accounts in the name of FRSC and ATOL received over $1.3 million in unexplained cash deposits. During this same time period, bank accounts in the names of FRSC and ATOL reflected over $2.7 million in cash withdrawals.

6. Bank accounts in the names of FRSC were further used to receive drug proceeds through transactions conducted by DANIELS, MASSEY, and other members of the drug trafficking organization, and to transfer monies contained therein to known suppliers of controlled substances, thereby advancing the goals of the drug trafficking organization.

7. MONROE submitted and caused to be submitted bills totaling over $1.3 million, which contained false and fraudulent statements, and which caused Wisconsin Medicaid to pay him over $1.1 million to which he was not entitled.

9

8.      On or about the dates set forth below, in the State and Eastern District of Wisconsin and elsewhere,

**PHILLIP DANIELS, SR., a/k/a "Dr. Phil,"**
**ROY HENTON, a/k/a "Pops,"**
**JOELLE MASSEY, and**
**LENARD MONROE**

for the purpose of executing the scheme described above, and in connection with the delivery of and payment for health care benefits, items, and services, knowingly and willfully submitted and caused the submission of the following false and fraudulent claims on the dates below, which falsely represent the nature of the provider's interaction with the member indicated below, falsely represented that covered services were provided, and falsely represented the amount of time spent providing covered services, which caused payments in the following amounts:

| Count | Service Date | Billed Date | Member | Amount Billed | Amount Paid |
|-------|--------------|-------------|--------|---------------|-------------|
| 25    | 5/23/2021    | 6/10/2021   | U.A.   | $80           | $80         |

In violation of Title 18, United States Code, Sections 1347 and 2(a).

5.      The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offenses described in paragraph 4. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment A beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt. This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in these offenses.

10

## PENALTIES

6.      The parties understand and agree that the offenses to which the defendant will enter a plea of guilty carry the following maximum penalties:

> Count One: a mandatory minimum of 10 years and up to a lifetime term of imprisonment; a fine of up to $10 million; and at least 5 years and up to a lifetime term of supervised release.

> Count Two: a maximum of 20 years; a fine of up to $500,000; and up to 3 years of supervised release.

> Count Ten: a mandatory minimum of 5 years, and up to life imprisonment, which must run consecutive to any other sentence; a fine of up to $250,000; and up to 5 years of supervised release.

> Count Twenty-Five: 20 years and $250,000. The count also carries up to three years of supervised release.

Each count also carries a mandatory special assessment of $100. The parties further recognize that a restitution order may be entered by the court. The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraph 38 of this agreement.

7.      The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney, including any possibility that the defendant may qualify as a career offender under the sentencing guidelines.

## PROOF OF DRUG WEIGHT FOR STATUTORY MAXIMUM PENALTY

8.      The parties understand and agree that for the penalties in 21 U.S.C. § 841(b)(1)(A) to apply, as provided in paragraph 6 above, the government must prove beyond a reasonable doubt that the offense to which the defendant is pleading guilty

11

involved at least 400 grams or more of a mixture and substance containing N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as fentanyl, a Schedule II controlled substance; 500 grams or more of a mixture and substance containing methamphetamine, a Schedule II controlled substance; 1 kilogram or more of a mixture and substance containing heroin, a Schedule I controlled substance; 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance; or 100 kilograms or more of a mixture and substance containing marijuana, a Schedule I controlled substance. The defendant agrees that the government possesses sufficient, admissible evidence to meet this burden.

## ELEMENTS

9. The parties understand and agree that in order to sustain the charge of conspiracy to possess with the intent to distribute and distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846, as set forth in the second superseding indictment, the government must prove each of the following propositions beyond a reasonable doubt:

> First, the conspiracy, as alleged in the indictment, existed, and;
> Second, the defendant knowingly and intentionally joined the conspiracy with the intention to further the conspiracy.

10. The parties understand and agree that in order to sustain the charge of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), as set forth in the second superseding indictment, the government must prove each of the following propositions beyond a reasonable doubt:

> First, an unlawful agreement to violate Section 1956 existed;

12

Second, two or more participants were involved;
Third, the defendant joined the conspiracy; and
Fourth, the defendant intended for the conspiracy to succeed.

11.    The parties understand and agree that in order to sustain the charge of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c), as set forth in the second superseding indictment, the government must prove each of the following propositions beyond a reasonable doubt:

First, the defendant committed a drug trafficking crime; and
Second, the defendant knowingly possessed a firearm in furtherance thereof.

12.    The parties understand and agree that in order to sustain the charge of healthcare fraud, in violation of 21 U.S.C. § 1347, as set forth in the second superseding indictment, the government must prove each of the following propositions beyond a reasonable doubt:

First, there was a scheme to defraud a health care benefit program, as charged in the indictment;
Second, the defendant knowingly and willfully carried out or attempted to carry out the scheme;
Third, the defendant acted with the intent to defraud the health care benefit program;
Fourth, the scheme involved a materially false or fraudulent pretense, representation, or promise; and
Fifth, the scheme was in connection with the delivery of or payment for health care benefits, health care items, and health care services.

## SENTENCING PROVISIONS

13.    The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than

13

35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

14. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

15. The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offenses set forth in paragraph 4. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

16. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

### Sentencing Guidelines Calculations

17. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand

14

and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

18.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

19.     The parties agree to recommend to the sentencing court that the relevant conduct attributable to the defendant is at least 10 kilograms of fentanyl, a Schedule II controlled substance; at least 50 kilograms of cocaine, a Schedule II controlled substance; at least 15 kilograms of methamphetamine, a Schedule II controlled substance; at least 2 kilograms of heroin, a Schedule I controlled substance; at least 1 kilogram of cocaine base, a Schedule II controlled substance, and least 100 pounds of marijuana, a Schedule I controlled substance.

## Base Offense Level

20.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count One is 36 under Sentencing Guidelines Manual § 2D1.1(c)(2). The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count Two is 36 under Sentencing Guidelines Manual § 2S1.1(a)(1). The parties agree to

15

recommend to the sentencing court that the applicable base offense level for the offense charged in Count Twenty-Five is 6 under Sentencing Guidelines Manual § 2B1.1(a)(2).

## Specific Offense Characteristics

21.     The parties agree to recommend to the sentencing court that a 2-level increase under Sentencing Guidelines Manual § 2D1.1(b)(12) is applicable to the offense level for the offense charged in Count One because the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance.

22.     The parties agree to recommend to the sentencing court that a 2-level increase under Sentencing Guidelines Manual § 2S1.1(b)(2)(B) is applicable to the offense level for the offense charged in Count Two because the defendant was convicted under 18 U.S.C. § 1956.

23.     The parties agree to recommend to the sentencing court that a 16-level increase for a loss amount of more than $1,500,00 under Sentencing Guidelines Manual § 2B1.1(b)(1)(I) is applicable to the offense level for the offense charged in Count Twenty-Five.

24.     The parties agree to recommend to the sentencing court that a 2-level increase for more than $1,000,000 loss to a government program under Sentencing Guidelines Manual § 2B1.1(b)(7)(B) is applicable to the offense level for the offense charged in Count Twenty-Five.

## Role in the Offense

25.     The parties agree to recommend to the sentencing court that a 4-level increase under Sentencing Guidelines Manual § 3B1.1 is applicable to the offense

16

charged in Counts One and Two because the defendant was an organizer or leader of that criminal activity.

## Acceptance of Responsibility

26.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Career Offender

27.     The parties acknowledge, understand, and agree that the defendant may qualify as a career offender under the sentencing guidelines. The parties further understand, acknowledge, and agree that the defendant may not move to withdraw the guilty plea solely as a result of a determination that under the guidelines, the defendant is determined to be a career offender.

## Sentencing Recommendations

28.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the

17

offenses as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

29.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

30.     The government agrees to recommend a sentence no higher than 352 months of imprisonment.

## Court's Determinations at Sentencing

31.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

32.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

33.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of

18

the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

34.     The defendant agrees to provide to the Financial Litigation Program (FLP) of the United States Attorney's Office, at least 30 days before sentencing, and also upon request of the FLP during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLP and any documentation required by the form.

### Fine

35.     The parties agree to recommend that no fine be imposed.

### Special Assessment

36.     The defendant agrees to pay the special assessment in the amount of $300 prior to or at the time of sentencing.

### Restitution

37.     The defendant agrees to pay restitution in the amount of $1,702,747.36, jointly and severally, to the below address:

Wisconsin Department of Justice

19

Medicaid Fraud and Control Unit
Attn: Ann Zenor
17 W. Main Street
Madison, WI 53703

The defendant understands that because restitution for the healthcare offense is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources. The defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

## Forfeiture

38.     The defendant agrees that all properties listed in the second superseding indictment, including the assets described in paragraph 1, subparagraphs a, g, j, k, l, n, r, and t, of the forfeiture notice, constitute the proceeds of the offenses to which he is pleading guilty or were used to facilitate such offenses. The defendant agrees to the forfeiture of these properties and to the immediate entry of a preliminary order of forfeiture. The defendant agrees that he has an interest in each of the listed properties. The parties acknowledge and understand that the government reserves the right to proceed against assets not identified in this agreement.

## DEFENDANT'S COOPERATION

39.     The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so. The parties acknowledge,

20

understand and agree that if the defendant provides substantial assistance to the government in the investigation or prosecution of others, the government, in its discretion, may recommend a downward departure from: (a) the applicable sentencing guideline range; (b) any applicable statutory mandatory minimum; or (c) both. The defendant acknowledges and understands that the court will make its own determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

## DEFENDANT'S WAIVER OF RIGHTS

40.    In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

    a.    If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

    b.    If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

    c.    If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d.    At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e.    At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

41.    The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offenses to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

42.    The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

43.    The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial

22

provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

## Further Civil or Administrative Action

44.     The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## GENERAL MATTERS

45.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

46.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

47.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

48.     The defendant understands that pursuant to the Victim and Witness

Protection Act, the Justice for All Act, and regulations promulgated thereto by the

Attorney General of the United States, the victim of a crime may make a statement

describing the impact of the offenses on the victim and further may make a

recommendation regarding the sentence to be imposed. The defendant acknowledges

and understands that comments and recommendations by a victim may be different

from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

49.     The defendant acknowledges and understands if he violates any term of

this agreement at any time, engages in any further criminal activity prior to sentencing,

or fails to appear for sentencing, this agreement shall become null and void at the

discretion of the government. The defendant further acknowledges and understands

that the government's agreement to dismiss any charge is conditional upon final

resolution of this matter. If this plea agreement is revoked or if the defendant's

conviction ultimately is overturned, then the government retains the right to reinstate

any and all dismissed charges and to file any and all charges which were not filed

because of this agreement. The defendant hereby knowingly and voluntarily waives

any defense based on the applicable statute of limitations for any charges filed against

the defendant as a result of his breach of this agreement. The defendant understands,

however, that the government may elect to proceed with the guilty plea and sentencing.

If the defendant and his attorney have signed a proffer letter in connection with this

24

case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## **VOLUNTARINESS OF DEFENDANT'S PLEA**

50.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 5/30/25

PHILLIP DANIELS, SR.
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 5/30/25

CRAIG S. POWELL
Attorney for Defendant

For the United States of America:

Date: 5/30/25

for RICHARD G. FROHLING
Acting United States Attorney

Date: 5/30/2025

ELIZABETH M. MONFILS
ERICA J. LOUNSBERRY
Assistant United States Attorneys

**ATTACHMENT A**

Had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt. These facts are based upon court-authorized Title III interceptions, information provided by law enforcement agents, surveillance, controlled purchases of controlled substances, physical evidence seized, confidential sources, financial records, and other evidence. This information is provided for the purpose of setting forth a factual basis for the defendant's guilty plea. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

## BACKGROUND REGARDING THE DANIELS DTO

In January 2022, members of the North Central High Intensity Drug Trafficking Area (HIDTA), the Drug Enforcement Administration (DEA), Homeland Security Investigations (HSI), and the Internal Revenue Service (IRS) initiated an investigation into individuals distributing large quantities of methamphetamine, heroin, fentanyl, cocaine, and marijuana throughout Milwaukee, Wisconsin, and elsewhere. Law enforcement officers identified the leader of the drug trafficking organization (DTO) as Phillip DANIELS SR., a/k/a "Dr. Phil," who established distribution locations in Milwaukee, Wisconsin; St. Paul/Minneapolis, Minnesota; and Chicago, Illinois.

The investigation resulted in courts authorizing the monitoring of several cellular telephones used by DTO members, including the phones of DANIELS, Jameel BRADLEY, SR., and Roy HENTON.

Interceptions and other evidence revealed that, beginning by at least October 2021, Joathan COLULA and Jimmy GONZALEZ MACIAS, California residents, supplied the DANIELS DTO with methamphetamine, cocaine, and fentanyl. Julio BARRAZA, another California resident, packaged and mailed the controlled substances to the DANIELS DTO using fictitious names. Deonte EDWARDS, also a resident of California, assisted DANIELS in purchasing controlled substances from the California-based sources of supply, used his business account to facilitate the payment of drug proceeds to the DTO's suppliers, and obtained, packaged, and sent controlled substances, including fentanyl, cocaine, and marijuana, to the DANIELS' DTO.

DANIELS was based in Milwaukee, where he operated at least one stash location at 52XX N. Teutonia Avenue. HENTON, also based in Milwaukee, was DANIELS' partner in DTO operations, and he manufactured and distributed controlled substances, frequented the Milwaukee DTO stash location, and retrieved parcels suspected to contain controlled substances. Kevin NELSON and Domonique LEWIS were Milwaukee-based DTO distributors. MASSEY, DANIELS' long-term girlfriend based in Milwaukee, received narcotics-laden parcels, distributed controlled substances, and laundered and facilitated the movement of DTO proceeds. Airline records show that DANIELS,

HENTON, and MASSEY all traveled from Milwaukee or Chicago to California on multiple occasions. Intercepted communications and surveillance reveal that these trips were to procure controlled substances for the DTO.

The DTO distributed methamphetamine, fentanyl, heroin, cocaine and other controlled substances in Minnesota. DANIELS and Michael WILLIAMS worked in partnership to manufacture and distribute controlled substances in the St. Paul/Minneapolis metropolitan area. WILLIAMS and DANIELS operated a stash location in Minneapolis. Ramona FRYER was a Minnesota-based DTO distributor who received narcotics-laden parcels, maintained a storage locker used to store drugs, frequented the Minnesota stash house, and laundered and facilitated the movement of DTO proceeds. Carla SMITH, FRYER's mother, was also a Minnesota-based DTO distributor.

Furthermore, the DTO distributed controlled substances in the greater Chicago, Illinois area. DANIELS and BRADLEY SR. worked in partnership to procure controlled substances, including methamphetamine and cocaine, for the DTO. BRADLEY SR. traveled with DANIELS to California and Memphis, Tennessee to facilitate and supply narcotics to the DTO. Itzel CRUZ GONZALEZ also worked with BRADLEY SR. and DANIELS to procure controlled substances, including methamphetamine, from GONZALEZ MACIAS. CRUZ GONZALEZ also facilitated the DTO by packaging controlled substances and accounting for DTO proceeds. DANIELS and BRADLEY SR. then worked together to distribute controlled substances in and around Chicago.

Court-authorized interceptions, physical and electronic surveillance, and postal records reflect that the DANIELS DTO used United Postal Service (UPS), FedEx, and/or the United States Postal Service (USPS) to ship and receive at least 45 parcels containing controlled substances, to include methamphetamine, fentanyl, cocaine, and marijuana. COLULA, BARRAZA, and EDWARDS sent the drug parcels to DTO-related addresses in Milwaukee, Wisconsin, and St. Paul, Minnesota, using aliases and/or fictious identifying information. During the course of the investigation, two narcotics-laden parcels were lawfully searched, resulting in the seizure of approximately 3 kilograms of cocaine from a package addressed and mailed to FRYER at her home address by BARRAZA in March 2022, and 1 kilogram of fentanyl from a package sent to DANIELS in Milwaukee in November 2022.

Throughout the course of the investigation, DTO members, including HENTON, used various business bank accounts to conceal and disguise the nature and source of their drug proceeds. DANIELS, HENTON, MASSEY, FRYER, and BRADLEY SR. deposited drug proceeds in the form of cash and cashiers' checks into (1) DANIELS' and Betty DANIELS' (B. DANIELS) business account, (2) COLULA's business account, and (3) EDWARDS' business account. DANIELS withdrew currency in the form of cashier's checks from his business accounts, which he then electronically transferred to

EDWARDS' business account in the name of Tier One Records, which EDWARDS used as a "funnel" account. After receiving the drug proceeds, EDWARDS withdrew the money and gave it to the DTO's California-based suppliers, to include COLULA and GONZALEZ MACIAS.

The investigation further revealed that DANIELS used various other methods to send drug proceeds to the California-based suppliers. DANIELS used "ghost" bags, sending luggage containing drug proceeds to Los Angeles, California, on flights that he did not board. On one occasion, COLULA was observed picking up a "ghost" bag. On another occasion, a "ghost" bag was lawfully searched, revealing $105,000 in bulk currency. The DTO also used couriers to drive the controlled substances from California to the Midwest at DANIELS' the direction. In January 2022, law enforcement seized approximately 7 kilograms of cocaine from a DTO courier while the courier was traveling from California to Milwaukee at the direction of DANIELS and BRADLEY SR.

On November 29, 2022, case agents executed numerous federal arrest warrants for DTO members and search warrants at DTO-associated locations. The search warrants resulted in the seizure of over 10 kilograms of fentanyl (pressed fentanyl and fentanyl in pill form), approximately 7.5 kilograms of cocaine, more than one kilogram of methamphetamine (crystal methamphetamine and methamphetamine pills), nearly 2 kilograms of heroin, ecstasy, oxycodone, approximately 170 pounds of marijuana, marijuana edibles, over $450,000, and 19 firearms.

### Phillip DANIELS

This investigation revealed that Phillip DANIELS was the leader of the DTO. While DANIELS' maintained a residence in Milwaukee, he frequently traveled to California, Minnesota (where he also maintained a residence), and Illinois to facilitate the DTO by manufacturing, storing, and distributing controlled substances. He coordinated the shipment of fentanyl, methamphetamine, heroin, cocaine, and marijuana through the mails, and he oversaw couriers who drove these substances from California to the Midwest. DANIELS also provided bulk currency to California-based suppliers by packing bulk cash in luggage, checking the luggage with an airline, and allowing the luggage to fly without boarding himself.

In addition to orchestrating the DTO, DANIELS also laundered drug proceeds by depositing cash into his business bank account for a supportive health care company he operated, and using cashier's checks to send money to EDWARDS' business account, which proceeds were withdrawn to pay suppliers. Finally, he also engaged in scheme to sign individuals up for supportive and personal care services with the State of Wisconsin Medicaid, maximize billing by coaching members' to feign limitations in daily living, submitting claims for services not rendered, and receiving funds for those services that were not rendered.

3

DANIELS was the user of two Target Telephones that were intercepted during the course of the investigation. Between August 24, 2022 and November 12, 2022, approximately 901 intercepted calls and/or text messages between DANIELS and others were deemed criminal and pertinent in nature.

### 1. *January 2022: Deerwood Drive Methamphetamine Seizure*

On January 5, 2022, DANIELS' and MASSEY's Deerwood Drive residence was searched after the USMS went there looking for a fugitive. USMS was allowed into the residence, which resulted in a federal search warrant based upon what was observed in plain view. A search resulted in the seizure of 1,781 grams of methamphetamine, which appeared to have been shipped to MASSEY in a dog food type container at the Deerwood Drive residence by Julio BARRAZA (a/k/a "Michael Herrera). Also located at this time, among other items, was 6 pounds of marijuana, $45,488 in U.S. currency, identifying information for DANIELS and MASSEY, and cashier's checks to COLULA.

### 2. *January 2022: Utah Cocaine Seizure*

On or about January 16, 2022, a traffic stop was conducted on a black Nissan Altima driven by SOI 2 near Summer, Utah. A drug detection dog alerted to the presence of narcotics in the trunk of the car, and SOI 2's vehicle was searched. The search revealed a white plastic container with a screw off lid containing seven brick-shaped objects, which tested positive for approximately seven kilograms of cocaine.

In a post-arrest, *Mirandized* interview, SOI 2 stated that the car was rented by BRADLEY SR., which was subsequently confirmed from surveillance video and documents related to the vehicle rental. SOI 2 stated that they were driving the black Nissan first to Chicago, and then to Milwaukee, where SOI 2 would be staying with MASSEY. SOI 2's phone was searched pursuant to SOI 2's consent. Located in SOI 2's phone was a text message from DANIELS dated January 12, 2022, which read " . . . this Dr. Phil Please give me a call."

SOI 2 later provided additional statements to law enforcement, including describing how SOI 2 had transported drugs from California to Wisconsin approximately four or five times at the direction of DANIELS and BRADLEY SR. On the first of these occasions, which occurred in approximately July 2021, SOI 2 delivered a washing machine to BRADLEY SR. and DANIELS at a Marriott hotel in Los Angeles, California. SOI 2 watched BRADLEY SR. and DANIELS taking apart the washing machine inside a hotel room. BRADLEY SR. told SOI 2 that they were putting marijuana in the washing machine. While SOI 2 did observe an approximate 3-gallon size bag full of marijuana being placed into the washing machine, SOI 2 also saw them place five to ten rectangular, kilo-sized packages wrapped in aluminum foil and tape in the washing machine.

4

Thereafter, BRADLEY SR. and DANIELS loaded the washing machine onto a Dodge pick-up truck. BRADLEY SR., SOI 2, and SOI 2's friend then drove the Dodge pick-up truck to Milwaukee to meet with DANIELS's son, C.D. Once there, the washing machine was unloaded.

SOI 2's subsequent trips were similar, with BRADLEY SR. instructing SOI 2 to buy other large furniture or household items that were used to conceal drugs during cross-country trips. SOI 2 further stated that DANIELS directed SOI 2 to obtain items commonly used by the DTO when packaging drugs in a manner designed to conceal them from detection, such as cleaning supplies, wipes, hand sanitizer, glue, and expandable foam.

### 3.  *March 2022: Bates Cocaine Seizure*

On or about March 4, 2022, case agents searched a 13-pound package sent to FRYER's address in St. Paul, Minnesota pursuant to a search warrant. Specifically, the package was addressed to "K-Maree #E 234 Bates Ave Saint Paul, MN 55106-5543." The package was shipped from "DXG Technologies 1001 S Lawson St City of Industry, CA 91748." Located within the package was a white plastic dog food container with a screw off lid, inside of which contained two plastic bags of cocaine totaling 3,005 grams, packing peanuts and expandable foam.

About one week before this parcel was set to be delivered—on February 23, 2022—COLULA's Bail Bonds Wells Fargo bank account ending in x0363, received cash deposits of $107,000 from L.H. (HENTON's son) and FRYER. Examination of financial information revealed that L.H. deposited $31,000 in cash and FRYER deposit $76,000 into COLULA's x0363 account on the same day but from different states. It is believed this payment was for the cocaine seized in March 2022.

### 4.  *July – September 2022: Controlled Buys*

During this course of this investigation, a Confidential Source hereinafter referred to as CS 3, at the direction and under the control of case agents, purchased controlled substances from HENTON and DANIELS. On July 14, 2022, CS 3 purchased approximately 6.9 grams of cocaine from DANIELS and HENTON in exchange for $460.

The following day, July 15, 2022, at approximately 11:35 p.m., DANIELS and HENTON visited CS 3 unexpectedly to provide "samples" of various controlled substances. DANIELS gave CS 3 three small corner cut baggies. The first bag contained five round blue pills with the inscription "M 30," which DANIELS referred to as "blue cheese." The second contained a clear shard, which DANIELS referred to as "sunglasses." The third contained a gray/purple rock-like substance, which DANIELS referred to as "Barney." DANIELS then produced a sandwich bag that contained a brown

5

powdery substance, which DANIELS referred to as "H-Town." CS 3 reported that DANIELS possessed a golf-ball size quantity of the brown powdery substance, from which DANIELS broke off a smaller quantity, which he placed in a corner cut bag for CS 3. DANIELS instructed CS 3 how much CS 3 could profit from the different types of narcotics if CS 3 were to find buyers for them, and he wrote down the prices of each of the drugs for CS 3 as shown below:



"Blue Cheese" referred to counterfeit Oxycodone Hydrochloride pills, "H-Town" referred to heroin, "Barney" referred to fentanyl, "Sunglasses" referred to methamphetamine, and "White Bitch" referred to cocaine. Field testing reflected that the samples DANIELS and HENTON provided CS 3 were approximately 2.895 grams of a substance containing heroin and fentanyl, approximately 1.106 grams of methamphetamine, approximately 2.7 grams of fentanyl, and 0.51 grams of fentanyl in pill form.

On July 26, 2022, CS 3 purchased cocaine and a heroin/fentanyl mixture from DANIELS and HENTON. CS 3 had several recorded calls with HENTON setting up the transaction. During one of these calls, HENTON told CS 3 that DANIELS had been stopped by law enforcement while on the freeway and that their transaction would be delayed until 3:30 or 4 p.m. as a result. Subsequently, HENTON called DANIELS, who traveled to the stash location on Teutonia Avenue. Once there, DANIELS called HENTON, and immediately thereafter, HENTON called CS 3 and told CS 3 that DANIELS was heading to HENTON's home. HENTON advised that he would bring DANIELS straight to CS 3.

Meanwhile, case agents observed DANIELS bring two bags that appeared to be heavy into the stash house. While inside, DANIELS had a thirty-minute call with HENTON. Afterwards, DANIELS exited the stash house carrying a black duffel bag and wearing blue latex gloves, and he entered his car and drove away.

A short time later, DANIELS and HENTON arrived together to meet CS 3. During their meeting, DANIELS asked CS 3 what he wanted. CS 3 answered, "I called

[HENTON] and text him. I said, 'I need a half of the soft and an ounce of the Barney.'" Thereafter, DANIELS quoted CS 3 prices for the soft (cocaine) and Barney (fentanyl). DANIELS then told HENTON that he had been mistaken about what CS 3 wanted, and he asked CS 3 for fifteen minutes to straighten things out.

HENTON and DANIELS then drove together in DANIELS' car to the Teutonia stash location. Both went inside, and they exited about 45 minutes later and reentered DANIELS' car. Both returned to the meeting point with CS 3, and they sold CS 3 13.77 grams of cocaine and 26.4 grams of a mixture of heroin and fentanyl for a total of $2,300

On August 31, 2022, CS 3 called HENTON and said, "I need uh, an ounce of that H-Town," referring to heroin. HENTON replied, "Just text it to me" and "I'll get on top of it right, uh, right away." HENTON further stated, "Text me all the—all, all, all the sugar cookies you want." Subsequently, CS 3 purchased 24.5 grams of heroin in "brick form" from DANIELS and HENTON in exchange for $1,500.

On September 20, 2022, CS 3—with whom HENTON had been involved in three previous controlled buys—purchased 66.47 grams of fentanyl in "brick form" from DANIELS for $3,880. An audio recording of this meeting reflects that during this controlled buy, DANIELS told CS 3, "It's hard to keep around… you follow me?" DANIELS further stated, "That real, authentic fentanyl [U/I]."

### 5.     *Memphis Trip to Procure Controlled Substances*

Beginning around August 31, 2022, DANIELS and BRADLEY SR. began planning a trip to Memphis to establish new customers for controlled substances. On September 1, 2022, at approximately 10:23 a.m., BRADLEY SR. called DANIELS to confirm they would leave for Memphis the following day. Later in the conversation, DANIELS indicated they would not purchase a large quantity of controlled substances from the supplier in Memphis during that trip because he could not get enough money together in time, and that instead they would travel to Memphis to inspect the product. Later in the conversation, BRADLEY SR. told DANIELS that he had "put visual on" the product the day before, to which, after additional conversation, DANIELS responded, "Dang! I ain't look at it, you know what I mean? 'Cause too many people was around, so." Later in the call, DANIELS and BRADLEY SR. discussed in coded language how they would operate once they secured a connection with this supplier, including how they planned to purchase ten kilograms of a controlled substance at once that would be resold to ten distributors. DANIELS stated, "You buy ten of those, ten of 'em," before explaining, "I got you, boom boo. We gonna tell you [U/I]. You fly in, you see, you fly back down and gonna meet you where you are." BRADLEY SR. replied, "Yup, that's true; that's right, wooo." DANIELS then said, "Here's the fee, here is the cost. Here is the monthly—here is the monthly charge. Now we got a monthly fee covered on all ten of 'em. Ten different bosses."

The next day, September 2, 2022, court-authorized location data for DANIELS' black GMC Yukon and cellular phone reflected that DANIELS had left his residence in Milwaukee at approximately 5:00 p.m. and arrived at the BRADLEY SR.'s residence in Illinois at approximately 8:03 p.m. According to physical surveillance, DANIELS went inside the residence, and both DANIELS and BRADLEY SR. exited together at approximately 10:45 p.m., with BRADLEY SR. leaving the area driving his silver Ford Explorer and DANIELS driving his black GMC Yukon.

A few hours later, on September 3, 2022, at approximately 12:59 a.m., DANIELS and BRADLEY SR. had a telephone conversation during which they spoke about seeing law enforcement on the freeway and that they had to slow down and use cruise control, likely because they were traveling with a large amount of U.S. currency or illegal contraband in the vehicle.

Later that morning, at approximately 7:43 a.m., DANIELS and BRADLEY SR. arrived at 36XX Allandale Lane in Memphis, Tennessee and entered that residence. At approximately 11:59 a.m., BRADLEY SR. was observed exiting that residence and entering the driver's seat of DANIELS' vehicle, which he parked in front of another residence. At approximately 12:18 p.m., BRADLEY SR. exited the Fox Meadows residence with an unidentified male and drove DANIELS' vehicle to a Walmart on Winchester Road in Memphis. Physical surveillance observed BRADLEY SR. at the money service counter located inside the Walmart, where he called DANIELS to discuss reconvening. During this conversation, BRADLEY SR. explained, "I'm at Walmart right now, [U/I] send some money." He also told DANIELS he was "finna grab this machine," which he later described using the words "the bullet" and "magic." Based on other similar intercepts during this investigation, it appears BRADLEY SR. intended to buy a Magic Bullet food blender to use for mixing controlled substances with adulterants.

After leaving Walmart, BRADLEY SR. and the unidentified male returned to the Fox Meadows Road residence, where they went inside and remained until approximately 2:11 p.m. BRADLEY SR. then entered DANIELS' vehicle again and drove in a manner that made it appear that he was trying to determine whether he was being followed, including making numerous turns and U-turns, and driving through parking lots. At approximately 5:04 p.m., BRADLEY SR. called DANIELS. During their call, DANIELS told BRADLEY SR. that DANIELS was at Bed, Bath, and Beyond, explaining, "I'll be right back, soon as I grab this here, uh, this magic stick," in apparent reference to another blender. BRADLEY SR. later asked DANIELS about whether they should get an unspecified quantity of heroin, which he referred to using the slang term "boy," saying, "Should we go get old boy? Or we goin' [U/I] these down?" DANIELS replied, "Y'all can go get him. Y'all… that'll kill time, 'cause when I get back there, you knowin' I'm a do what I do."

8

When interviewed, SOI 4 stated that DANIELS and SOI 4 went to Memphis to find prospective bulk quantity controlled substance customers. DANIELS and SOI 4 brought a half a kilogram of cocaine and about 200-300 grams of heroin. DANIELS and SOI 4 sold all of the cocaine and heroin and made $20,000 to $25,000 from the sales.

### 6. *November 2022: DANIELS' California Trip and Fentanyl Seizure*

On November 9, 2022, at approximately 8:52 p.m., DANIELS (who was in California at the time) received a call from GONZALEZ MACIAS. During the call, DANIELS stated he was planning on meeting GONZALEZ MACIAS at GONZALEZ MACIAS' Anaheim residence. The parties discussed various quantities of controlled substances, to include kilogram quantities of cocaine, that DANIELS wanted to purchase from GONZALEZ MACIAS. Then, DANIELS stated, "All right, I got you. Yeah, yeah then listen… I'm gonna be having my brother, my brother doing it. I'm gonna have my brother coming by for that two, ok?" GONZALEZ MACIAS acknowledged. DANIELS continued, "'Cause I be doing some small ones out here and I let just so he can make some money… But he's our little runner. Whenever you need him, he's gon run. That's that one, the first number I sent you. It say, 'Deonte.'" GONZALEZ MACIAS said, "Okay. Hold up, what do you—you want to leave him with a half right there just in case he comes?" DANIELS said, "Right, yeah, right. See, that's what I'm saying, like when I, I want to do something like that. You know what I'm saying?" Agents believe that DANIELS informed GONZALEZ MACIAS that EDWARDS would assist picking up the narcotics when ordered.

DANIELS subsequently traveled to GONZALEZ MACIAS' residence on November 9, 2022. The two continued to discuss obtaining more controlled substances the following day, before DANIELS left California.

At 11:30 a.m., GONZALEZ MACIAS called DANIELS and stated, "I just talked to him right now." DANIELS replied, "You did? What did he say?" GONZALEZ MACIAS stated, "He told me to go pick up those two that he said he didn't come with the food for the other one, for the one." DANIELS replied, "Okay, cool. Well, go grab those two real quick, and then we just, we gonna try wrapping everything up." Case agents believe that GONZALEZ MACIAS told DANIELS he (GONZALEZ MACIAS) called his controlled substance supplier and obtained two kilograms of a controlled substance to sell to DANIELS. GONZALEZ MACIAS' supplier was unable to obtain the third kilogram that DANIELS had originally requested, but DANIELS indicated he would obtain those from GONZALEZ MACIAS at a later time.

On November 10, at 5:39 p.m., DANIELS called GONZALEZ MACIAS. DANIELS stated, "I'm sending my little brother to you because I'm getting on my plane, and he gonna handle everything." GONZALEZ MACIAS replied, "Okay, I was gonna ask you, ummm, you need these two ASAP?" DANIELS replied, "I need them ASAP. Just, I'm

9

send them—listen: Give them to my brother [EDWARDS], you good to go." DANIELS later stated, "Take them what's his name. I'm gonna start sending you bread immediately. You hear me?" DANIELS continued, "The one who you—who's coming to you now, right? He's the one that's going to be bringing, he's the one who's going to be bringing money to you. You hear me? So, listen to me: You and me are going to be in communication all this week and all next week. You're going to have nothing but money coming. I gotchu. I gotchu."

Case agents believe DANIELS told GONZALEZ MACIAS he was sending EDWARDS to obtain two kilograms from GONZALEZ MACIAS. Case agents further believe that DANIELS told GONZALEZ MACIAS that EDWARDS would be bringing GONZALEZ MACIAS U.S. currency ("bread") in exchange for the controlled substances.

At 5:57 p.m., DANIELS called GONZALEZ MACIAS and stated, "Don't worry about the, uhhh, Playboy right now. He gonna give you the other 15. Take—put that with that." GONAZALEZ MACIAS affirmed, "Okay, yeah." DANIELS said, "And hold that for what you giving me right now, okay? And then when I get home, right? . . . I'll send, I'll send out some more and we can—we will wrap up that. We just tell your boys and them to hold off on the Playboy right now." Based on their training, experience, and knowledge of this investigation, case agents believe that during this call DANIELS told GONZALEZ MACIAS not to worry about the fentanyl ("Playboy") at the moment. Case agents believe "Playboy" in the context of this call refers to fentanyl because on November 11, 2022 case agents seized a DANIELS DTO parcel and observed that the "Playboy bunny" logo was stamped on a brick containing fentanyl. Case agents further believe that DANIELS told GONZALEZ MACIAS to put the money EDWARDS would soon be delivering toward the current drug order. DANIELS told EDWARDS that once he returned home, he would send more money for the fentanyl ("Playboy").

On November 10, at 7:00 p.m., DANIELS called EDWARDS. DANIELS stated, "You ain't responding quick enough." EDWARDS responded, "Oh, okay, you said. 'Did you give him the fifteen hundred?' Yeah, I gave him fifteen hundred and give you two. Oh yeah, he gave me two; yeah, he gave me two. Before he gives somethin' [U/I], I need to see what Morty gave [U/I]. Yeah, I'm just pulled up to Home Depot right now. [Stammers] Basically, yeah. Morty... I gotta count how much he gave, but, it feel like... It feel like probably three or four." DANIELS stated, "Right, I have to see what it is first." DANIELS later stated, "You said he gave you—what is it he gave you? He shoulda gave you five." EDWARDS responded, "Well, it feel like that. That's what I'm sayin'. [Stammers] It felt like at least four." EDWARDS later said, "All right, bet. Fuckin aaa... well that n**** Norm, he was, I was gonna be dropping him off before I even got back to the crib. So, what I'll do is I'll just FaceTime you when I walk to Home Depot. And I'll show you what it is right there in the trunk." Based on their knowledge of this investigation and this conversation, case agents believe that EDWARDS procured controlled substances for DANIELS through "Morty" and GONZALEZ MACIAS.

Because EDWARDS was in possession of a large amount of controlled substances, two kilograms from GONZALEZ MACIAS and four-five kilograms from Morty, DANIELS was worried about EDWARDS not answering the phone.

Later in the conversation, EDWARDS stated, "So now, this is what I remember Morty said. Uh, his boy was supposed to bring one more and he told me to call him when I was leaving Anaheim. So, he could probably correlate it with me on my way back, uh, towards Hollywood. So should I call that n**** right now?" DANIELS affirmed, "All right. Call him now." DANIELS later told EDWARDS, "And then, ask him, ask him about that girl that he was supposed to let me mess around with. All right?" EDWARDS replied, "He said it's at a warehouse he just wasn't able to get to it today." EDWARDS later asked DANIELS, "So you want three, two and girl?" DANIELS replied, "Three and two, and I still wnna fuck with ol' girl." DANIELS later said, "Okay, just tell him. He knows that, right? Just tell him he supposed to gave me… he supposed gave me three, right? Then he gave me the uh, uh, two, uh, black tires. And then he still supposed to let me fuck with ol' girl. So you should have in total six." Case agents further believe that during this call, DANIELS expressed his desire to buy cocaine, referred to here by the common street name "girl," from a California-based supplier with whom EDWARDS would later meet. Case agents believe that DANIELS wanted EDWARDS to obtain kilograms of different controlled substances with at least one being a kilogram of cocaine. Case agents believe that "black tires" is code for another kind of unknown narcotic. Location information confirms EDWARDS drove to GONZALEZ-MACIAS' house to obtain controlled substances at DANIELS' direction for the DTO.

As a result of DANIELS' California trip, case agents are aware of at least 5 drug-related parcels that were shipped to various DTO addresses. Since DANIELS returned from California, he communicated with EDWARDS about ensuring EDWARDS "has enough money for supplies," to include "foam." DANIELS and EDWARDS also discussed the status of multiple parcels that were shipped to DTO addresses, trying to determine which ones were delivered and where the others were in transit.

On November 11, 2022, case agents located an 11-pound parcel, sent from California on November 8, 2022, set to be delivered to XXXX West Fond Du Lac Avenue. The parcel was thereafter searched pursuant to a warrant. Upon opening the parcel, case agents found an off-white plastic dog food container surrounded by Styrofoam packing peanuts. Within that container agents located a white brick-like substance, which was stamped with the Playboy Bunny logo in the center of the object and which contained 1,125 grams of fentanyl. Video surveillance depicts DANIELS and EDWARDS mailing this parcel and another parcel from California.

7. *November 29, 2022: Search Warrant Executions*

### DANIELS' Milwaukee Stash

DANIELS operated 52xx N. Teutonia Avenue, Milwaukee as a stash house. Other DTO members were observed frequenting this location. On November 29, 2022, case agents also searched the stash location on Teutonia Avenue pursuant to a federal search warrant and recovered 818 grams of fentanyl, 38.9 grams of fentanyl pills, 39.3 grams of p-Fluorofentanyl, 2,140 grams of cocaine, 31 grams of cocaine base, 85.7 grams of methamphetamine pills, 123 grams of heroin, and 120 grams of Oxycodone. DANIELS, HENTON, and MASSEY were observed entering the Teutonia Avenue stash location the previous night, on November 28, 2022, with DANIELS and MASSEY.

Six firearms were also located in the same bedroom as the controlled substances:

- o Kel-Tec CMR-30 .22 caliber semi-automatic rifle that had a magazine inserted into the firearm but did not have a round in the chamber (Serial# Y9872)
- o Kel-Tec 12 gauge shotgun that did not have rounds in the tube (Serial# 5MG1638)
- o C Walther/Waffenfabrik .22 caliber semi-automatic handgun that had a magazine inserted into the firearm but did not have a round in the chamber (Serial# WA028699)
- o Whitney .22 caliber semi-automatic handgun that had a magazine inserted into the firearm but did not have a round in the chamber (Serial# WW1809)
- o Smith and Wesson .357 caliber revolver with no unfired rounds in the cylinder (Serial# N514187)
- o CMMG 9mm semi-automatic rifle with no magazine or rounds (Serial# 5MG1638).

### DANIELS' Milwaukee Residence

On November 29, 2022, DANIELS' and MASSEY's primary residence located at 96xx West Bradley Road #203 in Milwaukee was searched. Officer located approximately $48,072 in their upstairs bedroom. Officers also seized DANIELS GMC Yukon (M0NEY23), MASSEY's red Chevrolet Camaro, and a Dodge Durango Hellcat SRT, which formerly belonged to C.D.

12

DANIELS' GMC Yukon was also searched pursuant to a warrant. Approximately 594.3 grams of fentanyl (Including original packaging) were located in a natural void.

## DANIELS' Minnesota Residence

DANIELS' maintained a residence with FRYER at 44XX Reindeer Lane, Eagan Minnesota. Their previous residence was XXX Bates Avenue.

The investigation in this case revealed that DANIELS and FRYER were using the Reindeer Lane residence to further their DTO operation in Minnesota. For example, on October 18, 2022 at approximately 8:30 p.m., when DANIELS was at the house on Reindeer Lane, he had an intercepted call with an individual he called "Billy" that was over three hours long. During the call, the parties discussed the large amounts of money DANIELS has made or helped others make. Sounds consistent with the manufacture and packaging of drugs for distribution can be heard in the background throughout this call, including the use of a vacuum sealer, a vacuum, a blender, and a money counter machine.

As discussed above, parcels that contained controlled substances were sent to the house on Reindeer Lane, including on October 6 and 11, 2022. These parcels were sent from California (one from the same city as additional DTO parcels), the weights of the parcels were comparable to other DTO parcels known to contain drugs, the shipping was paid for in cash (in order to avoid law enforcement identification of the person shipping the drugs), and the recipient was listed as FRYER's daughter.

DANIELS, FRYER, and other co-conspirators sometimes discussed DTO parcels in calls that were intercepted during the investigation of this case pursuant to a Title III wiretap. For example, on November 11, 2022, at approximately 1:37 p.m., FRYER called DANIELS and talked about receiving "two packages." DANIELS told her he was still expecting a third to arrive.

A few days later, on Thursday, November 17, 2022, at 4:43 p.m., DANIELS called EDWARDS, who was a DTO supplier in California, and asked about additional packages, saying, "Hey, can you see when that plane landed at last? […] It should've landed in St. Paul." EDWARDS responded, "Uh, let me see, let me see." Later in the conversation, EDWARDS told DANIELS that the UPS tracking data indicated the package in question was "out for delivery at 9:28 a.m., and then delivered at 12:23 p.m., St. Paul." DANIELS then clarified that he had already received this package and that he needed EDWARDS to check a different package, saying, "You got two going to St. Paul and two going to Reindeer?" EDWARDS answered, "This one for Ramona [FRYER], St. Paul. They got a picture of it." Court-authorized location information for FRYER's vehicle reflected that she had left the Reindeer Lane address at approximately 1:50 p.m. and driven to 2XX Bates Avenue, where she stayed for only about 15 minutes before driving straight back

to Reindeer Lane. FRYER made this trip to pick up the two packages sent to St. Paul that DANIELS and EDWARDS discussed during their call.

On November 29, 2022, warrants to search DANIELS' and FRYERS' home on Reindeer Lane in Eagan, Minnesota, as well as the storage locker FRYER maintained under the name "Nisha Petty" in Grove Heights, Minnesota, were obtained in the District of Minnesota and executed on the same date.

The search of 44XX Reindeer Lane yielded the following controlled substances, based on field testing:
- 177.61 grams of fentanyl,
- 55.35 grams of crystal methamphetamine;
- 112.92 grams of methamphetamine pills;
- 103.11 grams of crack cocaine,
- 8.69 grams of powder cocaine;
- 418 grams of ecstasy pills; and
- 3,294.26 grams of marijuana

These controlled substances were found scattered throughout the house. For example, located in a purse on the kitchen counter were fentanyl, methamphetamine, ecstasy, marijuana, and Xanax bars. Fentanyl and marijuana were located in the master bedroom closet. A kitchen drawer contained fentanyl and ecstasy. Methamphetamine, fentanyl, and ecstasy were located in a tub in the kitchen.

Other evidence of narcotics trafficking from this residence included a money counter, a scale with white residue, vacuum sealer, packaging commonly used for narcotics distribution, and a ledger on the master bedroom end table. Additional methamphetamine and marijuana was located in the console of a vehicle parked outside. Additionally, $1,477 U.S. currency was also located in the residence.

### Minnesota Storage Unit

The search of FRYER's storage locker yielded the following controlled substances:
- 797 grams of fentanyl;
- 1,140 grams of fentanyl pills;
- 500 grams of crystal methamphetamine;
- 998 grams of heroin
- 1,188 grams of powder cocaine; and
- 647 grams of cocaine base

14

## WILLIAMS' Minnesota Stash

The investigation revealed that WILLIAMS operated a stash house at 31xx Thomas Avenue North, Minneapolis, Minnesota (Thomas Stash), which residence WILLIAMS used as a primary residence between approximately March 2022 to August 2022. Intercepted calls, physical and digital surveillance, and documentary evidence revealed that DANIELS and WILLIAMS manufactured controlled substances and prepared them for distribution at this location.

Between August 24, 2022, and October 29, 2022, case agents believe DANIELS and WILLIAMS used the Thomas Stash to manufacture controlled substances on at least three occasions (approximately August 28-29, October 9, and October 28). Location information for WILLIAMS' vehicle (a black 2018 Dodge Durango bearing Minnesota Registration HDV059) and DANIELS' GMC Yukon, and physical and digital surveillance, reflected WILLIAMS and DANIELS were both at the Thomas Stash during these times. Additionally, intercepted calls during or shortly after these Thomas Stash house visits, wherein DANIELS recounts "working" and being "sick from work," led case agents to believe that DANIELS and WILLIAMS brought controlled substances to this location, mixed and/or added cutting agents/adulterants to the substances, and prepared the substances for distribution.

On November 29, 2022, the location at 31xx Thomas Avenue N., Minneapolis, Minnesota was searched pursuant to a federal search warrant. Officers located the following controlled substances at this time:

- approximately 3,471 grams of fentanyl, comprised of fentanyl pills and pressed fentanyl;
- approximately 302 grams of heroin (or possibly fentanyl);
-  approximately 596 grams of crystal methamphetamine;
- approximately 553 grams of powder cocaine; and
- approximately 7,600 grams of marijuana

The controlled substances were located in the following areas of the Thomas Stash: basement dryer, various bedrooms, the dining room, and kitchen. Investigators also recovered from this residence a small scale with residue from the dining area,  two metal manual metal drug presses in the kitchen, and a white plastic dog food container in the dining room,

## HEALTHCARE FRAUD

DANIELS and HENTON operated two supportive cares agencies, First Response Supportive Care (FRSC) (registered to Betty DANIELS and controlled by DANIELS), and

A Touch of Love (ATOL) (owned and operated by HENTON), that billed Wisconsin Medicaid. DANIELS, HENTON, and MASSEY to submit timesheets to Wisconsin Medicaid to induce payment for services allegedly rendered to their clients. From approximately January 2019 through August 2021, FRSC bank accounts electronically received approximately $250,000 from Wisconsin Medicaid. Additionally, from March 2019 to May 2020, a bank account controlled solely by B. DANIELS received approximately $10,000 from Wisconsin Medicaid. From January 2019 through October 2021, bank accounts controlled by HENTON in the name of ATOL received approximately $959,000 from the State of Wisconsin Medicaid.

The evidence gathered during this investigation of this case, however, reflects that the invoices billed to and paid by Wisconsin Medicaid were fraudulent in that services were not rendered to the purported clients in the manner detailed on the timesheets. In many instances, no services were rendered at all. Instead, DANIELS and HENTON, through their agencies, offered to their clients reduced-rate housing at properties they rented in exchange for their clients' Medicaid information, which they used to bill the State of Wisconsin Medicaid for services that were never provided.

In some instances, DANIELS and HENTON gave their clients a cash kickback in the form of a "stipend." These kickbacks were tracked in both handwritten and typewritten ledgers and referred to as "payroll." Clients typically had to sign for their payments. The payments were generally hand-distributed weekly (or, in some instances, bi-weekly or monthly) by so-called personal care workers in envelopes. A few clients, however, received the payments electronically via CashApp.

These activities were reflected in intercepted calls involving HENTON, DANIELS, and others. For example, on September 18, 2022, at 6:52 p.m., HENTON received a call from a client named "Ashley" who said, "Hey, Pops. Uh, question: How much is my rent gonna be this month?" DANIELS then joined the call and replied, "It's 350 each month; that's what it is." Ashley responded, "Oh, so you're not gonna give me a discount?" DANIELS replied, "There's not gonna be a discount. Why—why would you have… Oh, oh, oh, 'cause you—right; I apologize. You on services with us now. I- This is Doctor Phil. Let me, let me go over your file and everything and make sure everything is going well, and I'll call you back with it, okay?" Minutes later, at approximately 6:58 p.m., DANIELS called Ashley back and stated, "Hey, Ashley. One—175, okay? . . . That's the rent now."

Additionally, on September 12, 2022, a representative of Community Family Care called HENTON inquiring about a client who was considering switching services to HENTON's agency. During this call, HENTON told the caller that they sign people up for supportive cares, "give out monthly stipends," and "help people with" housing.

Some of the FRSC and ATOL clients who needed services complained to HENTON, DANIELS, and/or MASSEY that they were not receiving services, however

16

the services still were not rendered. On the other hand, many of DANIELS and HENTON's clients did not qualify medically to receive supportive cares. DANIELS and HENTON coached these clients to feign limitations in activities of daily living in order to make it appear as though they were qualified. In other instances, DANIELS and HENTON instructed clients to exaggerate their limitations to increase the hours that could be billed to Medicaid.

An example of this coaching occurred on September 12, 2022 at approximately 9:28 a.m. HENTON received a call from a female client whom he and DANIELS called "Denise." During the intercepted call, Denise stated, "Hey, I have a question: The nurse was just here the other day for the evaluation, and now the other one is coming in because she wants me to... Well, she's doing all my check-ins now, but she wants me to tell her what... whoever comes over, you know, to the house... what they do for me every day. I don't know what to say because I don't know how many hours you supposed to be here." HENTON then asked, "Who wants to know that?" Denise responded, "IRIS."[1] HENTON asked whether it was "for [her] consultant," and Denise acknowledged it was. DANIELS got on HENTON's line and stated, "Okay, so, um, you have Delores... You tell her that A Touch of Love does services. You have multiple people who come, and two of the people is Delores Giller and Joelle MASSEY. Two of the workers that work for A Touch of Love is Joelle and Delores... and Joelle MASSEY, right? And your daily activity consists of—One is arranging your clothes…" DANIELS continued, "Helping you pick out and sort your clothes. Two is helping you plan out your day. . . Three is store runs; they make store runs for you. . . Number four, number four is—is meal prep… Uh... uh... Number five is to help you to sort out all your bills so you can make bill payments. . . And then they also do take care of your medical and doctor runs, picking up your medications." Denise then asked, "And this is what IRIS will be doing for me?" DANIELS stated, "No, this is what A Touch of Love—this is what A Touch of Love…" HENTON interjected, "IRIS don't do anything; they just come out." HENTON added that IRIS is "supposed to report the case, what A Touch of Love do with the services they give, the services that happen with you every day."

As the call continued, DANIELS stated, "Right, I just told you, you gotta write that down. Write that down; say, 'They take care of my baths.' That's another one; write down—say, 'Bathroom. They help me get in and out of the shower,' right? 'They help me get in and out of the shower as well.' You know what I'm saying? "I can't get up and move around; they help me with these needs.'" HENTON added, "You gotta always say that we—'cause you got very low hours." Denise replied, "And that's why they doing

---

[1] The IRIS program (**I**nclude, **R**espect, **I S**elf-Direct) is a Medicaid Home and Community-Based Services (HCBS) waiver program authorized under § 1915(c) of the Social Security Act and approved by the Centers for Medicare and Medicaid Services (CMS). IRIS is a self-directed program for adults with disabilities and elderly people in Wisconsin. To be eligible for the IRIS program, one must be eligible for Medicaid, need the same level of care as someone in a nursing home, and live in a home, apartment, adult family home, or residential care apartment complex.

17

this, because they were only were giving you whatever, seven hour a week, and I told her I needed 15, so then I can get you the damn money. But I gotta tell her... she needs to know exactly what they are doing every day, so it's going to be more than pick up my clothes. She's gonna have to help me get in the shower, then help me get all dress, you know, that kind of. . . ."

Later in the call, DANIELS stated, "And here's the thing, too, Denise. Let me share this with you. Are you listening to me? I'm gonna share this with you, right? You can't—Remember, me and you talk about this before. With these services you can't—you have to let your pride go." Denise replied, "I know. And I did when the nurse was here." DANIELS continued, "But if the nurse asks, you say, 'Listen, I have a cognitive—I am cognitively delayed, and I [don't] know how to count and read and write. I need someone to help me with my bills and to read my mail and different things like that.' Say, 'I'm part of the older generation who didn't know how read and write.' Now, when you give them things like that, they also gives them the ability to write that down and say, 'Well, hey, we never had this; have you talked to your doctors?' 'Yeah, my memory is not good.' 'Have you had a memory test?' Like, 'No.' So now they schedule you for these things, and these are just simple things that are very easy for us to pass. You follow me? . . . They ask you five or six questions, da-da-da-da. You answer some of them wrong; you got bad memory. Uh... the doctor overlooks it. 'She says she don't know how to read.' He won't even ask you to read nothing; he just really writes it down and says that you are cognitively delayed concerning your reading and your ability and things like that. Those give you hours; they give you—that tells them that the people who are servicing you have—they have to do more for you. Plus, the State requires that anybody who has not—who's cognitively delayed, cannot read, cannot write—are people who are qualified for SSI, qualified for more assistance. So these are—this is just something some of the things we have been able to use over the [U/I]."

Denise replied, "They are never going to—I mean, I have a college education. So, I mean, they are never going to look into this, right?" DANIELS stated, "No, they are not going to look." Denise responded, "Okay, 'cause clearly I am bullshitting." DANIELS acknowledged, and HENTON stated, "They are plenty of people that have a college education that [U/I]." Denise asked, "When they are on their forties and fifties?" HENTON replied, "Yeah," and Denise then stated, "Well, I guess I can be one of them."

During this same call, DANIELS told Denise that "all [the doctors] care about is this: If you tell your doctor something and he puts it in his notes, that's all they care about." DANIELS then stated, "That's why when I go to the doctor with people. I'll go in and list some of the major things that I, I list. But I haven't been able to do that with you, per se, so that we can do it with your doctor, because you was at the, that clinic, and we wasn't able to get there. You got a real doctor. Once you have a real doctor, you did the... Like, I can take you back in there, and I can say, 'Hey, how are you doing? This is my mother-in-law. She is going through this, this, and that. These are some thing that she has

18

never reported.' And then, once you put all that on there, now they will begin to look at your medical. So that's what they was just telling the--over at the other company. They just like, 'Denise having Medicaid. She has very few illnesses. She just has illnesses. She wants disability.' And, like, boom, boom. And I just like, 'Well, there's still proof of the services, because you gotten the services before so...' A lot of companies worry, but your doctor has... a medical condition that allows you to have services. But at the same time, people like IRIS and them, they are not looking in depth. That's why they gave you most services, 'cause they don't really see a big, big medical file; no long medications and all those things like that, 'cause you don't take them. So that's why with me, before I was telling you, it would have been really good for me and you to had you a regular doctor. We could have you some medications, even though you never took 'em; they just sat in there. They prescribe them to you, sell them to you, and you leave then on the shelf, you know? Different creams, different pills and things like that, so that whenever we want to tell them and say, 'Oh, well, the medication is giving her side effects; this is happening,' they give you hours for that because the [U/I].'" Denise replied, "Okay, well, she's gonna be here in a few minutes, so I'm gonna go [U/I] and get my walker [U/I], okay?"

In addition to the fraud committed through FRSC and ATOL, DANIELS, HENTON, and MASSEY conspired with codefendant Lenard MONROE to sign their clients up for services that were never rendered through Wellness Personal Care Services (WPCS), a personal cares agency run by MONROE. In exchange for client referrals, MONROE paid DANIELS and HENTON bi-weekly kickbacks. Between September 2020 and December 2021, WPSC (Monroe) paid FRSC approximately $782,000 for DANIELS' and HENTON's kickback payments. The memo line of almost every check written to FRSC from WPSC indicated that it was for "payroll" or "consultant," however records from the State of Wisconsin show that no wages were actually paid to DANIELS, HENTON, or FRSC.

Text messages and interviews with alleged personal/supportive cares workers (PCWs) for these agencies establish that MONROE, MASSEY, DANIELS, and HENTON worked together to create false timesheets, personally or by directing others to do so. MASSEY's cell phone was also searched pursuant to a federal search warrant, and text messages therein reflect that the co-conspirators filled out timesheets submitted to Medicaid for billing according to templates or prefilled sheets, rather than actual work performed. The co-conspirators typically filled a stack of timesheets all at once, checking the same boxes for the types of work performed, the days and hours worked, and PCW mileage, without regard for any actual work performed. These sheets were all filled out identically, to match a "sample" timesheet supplied by DANIELS or MONROE. Client names, PCW names, and dates were filled in later.

When search warrants were executed at the business premises for WPCS, ATOL, and FRSC on November 29, 2022, investigators located a number of WPCS timesheets. Each timesheet generally contained identical information regarding services performed,

despite the clients' different conditions and needs. For example, almost every client allegedly received a "sponge bath bathroom" every day but Wednesday, when they purportedly received a "shower."

When law enforcement interviewed 16 of the clients whose information ATOL and WPSC used to bill Medicaid, none reported ever needing, requesting, or receiving a sponge bath. These clients generally denied receiving any of the claimed services, aside from a few instances of assistance with transportation to an appointment or laundry. They also largely denied signing the timesheets. Moreover, each of the recovered timesheets reflected the same number of hours worked and total miles traveled, even when different PCWs were allegedly performing the services. Law enforcement also confirmed that many of the PCW signatures on the timesheets had been forged.

For example, U.A. told case agents that U.A. met DANIELS and HENTON and after responding to an advertisement for housing assistance in a "blue book" magazine. According to U.A., the advertisement offered assistance for those on Medicaid. U.A. suffers from diabetes, seizures, high blood pressure, and broken vertebrae in their back. According to U.A., MASSEY brought a nurse over to U.A.'s apartment for an initial assessment. U.A. stated, "WPCS and ATOL haven't done anything for me." U.A. never signed any care worker time sheets (which are required to be completed by the personal or supportive care worker and signed by the client). Therefore, any signature on timesheets for U.A. from these businesses that were submitted to Medicaid would contain a forged signature and falsified information alleging services rendered. According to Medicaid records from the State of Wisconsin, since January of 2020, ATOL and WPCS both billed for services allegedly rendered to U.A. and received payments of approximately $24,580 and $44,700, respectively, from the State of Wisconsin Medicaid for those purported services. Specifically, on June 10, 2021, ATOL billed and received from Wisconsin Medicaid $80 for services for U.A. purportedly performed on May 23, 2021, when in fact these services were never rendered.

Based on Medicaid billing records, ATOL, FRSC, and WPCS received money for services never performed for the 16 individuals interviewed, and for the individual identified above as "Denise." The total amount of U.S. currency ATOL and FRSC received for these individuals was $568,989.00. The total amount of U.S. currency WPCS received for the same individuals was $1,133,758.36.

## SOURCE INFORMATION

In early 2021, DEA and the Bureau of Criminal Apprehension in Minneapolis/St. Paul, Minnesota, were conducting a drug trafficking investigation in which approximately five pounds of methamphetamine, paraphernalia consistent with kilogram level distribution, and U.S. currency were seized from an individual later identified as confidential source (CS) 1.

20

Beginning in November 2021, law enforcement conducted an interview of CS 1. CS 1 stated that CS 1 has known "Dr. Phil" since approximately September 2020. CS 1 identified DANIELS by photograph as "Dr. Phil." CS 1 stated that CS 1 sold multiple kilograms of cocaine, heroin, and methamphetamine for DANIELS and HENTON from approximately September 2020 to January 2021, in the Saint Paul/Minneapolis area. According to CS 1, the narcotics were shipped to Minnesota, and a typical shipment would contain six kilograms of cocaine, six kilograms of heroin, and approximately thirty pounds of methamphetamine. CS 1 estimated that CS 1 received approximately 15-20 kilograms of cocaine, 60-80 kilograms of meth, 10 kilograms of heroin/fentanyl

CS 1 indicated that DANIELS traveled via a commercial airline multiple times a month to see if people were ready for more controlled substances, i.e., resupply and/or collect money from his various runners who assisted the DTO. CS 1 stated that DANIELS took these flights with U.S. currency inside of his luggage. CS 1 also called DANIELS when more product was needed or when money was ready for pickup. CS 1 stated that DANIELS also set up numerous LLCs, which DANIELS used to get loans to move money. CS 1 indicated that DANIELS directed CS 1 to sell the narcotics, and DANIELS picked up the money at a later date. CS 1 indicated that if DANIELS did not pick up the money, CS 1 deposited drug proceeds into a Chase bank account under one of DANIELS' LLCs associated with a health care business, possibly "First Responsive Supportive Care."

Furthermore, CS 1 told case agents that HENTON had advised CS 1 that HENTON "rounded up" "crackheads" and kept them "in line" by the group. According to CS 1, HENTON's and DANIELS' clients were, in some cases, provided narcotics and were also sometimes forced to log hours to make the healthcare businesses appear legitimate to the government. CS 1 believed the healthcare businesses were a scheme to fraudulently collect money from government and government programs. Additionally, contained within CS 1's telephone was an employment letter DANIELS sent to CS 1 via text. The letter indicates that CS 1 had been accepted for full-time employment with ATOL. In the letter, DANIELS stated that he was the "Chief operating officer" of ATOL. CS 1 indicated that DANIELS wrote this letter so that CS 1's court-ordered travel restrictions would be lifted so that CS 1 could travel to other areas of the United States to sell narcotics for him.

According to CS 1, at the direction of DANIELS, CS 1 deposited the proceeds from narcotics sales conducted by CS 1 (which were also directed by DANIELS) into a Chase bank account controlled by DANIELS. Bank records reflect that CS 1 deposited drug proceeds into the Chase account on at least three occasions in September and October 2021, and the deposits totaled approximately $102,335.

SOI 4 identified DANIELS as a controlled substance trafficking associate. SOI 4 stated that DANIELS would obtain large quantities of controlled substances from California and BRADLEY would assist DANIELS in transporting the controlled

substances and their subsequent sales. SOI 4 detailed DANIELS' procuring kilogram quantities of cocaine and fentanyl/heroin, pound quantities of methamphetamine, and thousands of fentanyl pills from California-based suppliers.

SOI 3 stated SOI 3 purchased 50-60 pounds of marijuana from DANIELS, but SOI 3 did not receive all of the marijuana because some got seized by law enforcement.

## MONEY LAUNDERING

The DTO used ATOL, FRSC, and other bank accounts to funnel and disguise the source of drug proceeds. Case agents subpoenaed and examined bank records for the period between January 2018 and May 2022 for DANIELS, B. DANIELS, HENTON and their supportive cares agencies. While these accounts were set up as business bank accounts and collectively received well over $1,500,000 in Medicaid payments, records for these accounts reflected minimal legitimate business expenses and no payroll services during that period.

Instead, the accounts all showed patterns of unexplained cash deposits and large cash withdrawals uncharacteristic of a legitimate healthcare business. These accounts also were drawn upon to transfer money to known DTO suppliers. During the period described above, the accounts collectively received approximately two million dollars in unexplained cash, while withdrawals totaled over $2,700,000.

For example, from January 2021 to May 2022, a BMO Harris bank account ending in x4242 in the name of First Response Supportive Care received approximately $171,000 from Wisconsin Medicaid and approximately $70,000 in cash deposits. This account had $241,000 in cash withdrawals during the same period. On October 21, 2021, $50,000 in funds from the BMO account ending in x4242 were used to obtain a cashier's check made out to DTO supplier Joathan COLULA. This check was deposited into a bank account in the name "COLULA's Bail Bonds." The memo line on the check stated, "For Services Rendered." The remitter was listed as "First Response Sup."

Additionally, on October 17, 2022, DANIELS called B. DANIELS on an intercepted line. During the call, DANIELS went to a bank branch and could be heard asking for a cashier's check in the amount of $10,361 to be made out to "Tier One Records," an account held by DTO middleman Deonte EDWARDS.

Between May 31, 2022, and September 30, 2022, EDWARDS received at least $200,000 from DANIELS, either in the form of cashier's checks from accounts linked to DANIELS or in cash. More specifically, EDWARDS has received at least $71,000 in cashier's checks from DANIELS' business, First Response Supportive Care, or Intelligent Investments, and at least $129,000 in cash deposits from DANIELS and FRYER. Records

22

further reflect that EDWARDS withdrew cash in close proximity to these deposits, which he then provided as payment for controlled substances.

DANIELS, HENTON, and B. DANIELS' used a previous FRSC bank account in a similar way. On August 11, 2015, B. DANIELS opened an account ending in x7680 at Chase Bank. On October 21, 2015, DANIELS was added as a signer on the account. Bank records for January 2018 to December 2020 reflect that the account received approximately $194,000 from Wisconsin Medicaid and approximately $1,186,768 in cash deposits. Cash deposits did not begin until January 2020, and during the subsequent twelve-month period, over $1,000,000 in unexplained cash was deposited into the account. One of these cash deposits, in the amount of $75,000, was made by HENTON on July 2, 2020. From January 2018 to December 2020, approximately $1,677,633 in cash was withdrawn from this account. DANIELS withdrew over $1,000,000 in cash from this account in 2020 while he was in California, where the DTO was known to source narcotics. Like the BMO accounts, the Chase account did not have any traditional payroll activities or outgoing checks to nurses, clients, or other healthcare related expenses. Cash deposits accounted for 70% of all the credits into the account and cash withdrawals accounted for 77% of the debits.

HENTON and DANIELS also used ATOL's bank accounts in similar ways. On or about January 1, 2018, HENTON opened Educator Credit Union (ECU) bank accounts ending in x413_08 (ECU 1) and x413_00 (ECU 2). Both accounts were opened in the name of A Touch of Love (ATOL). HENTON was the sole signer for this account until March 18, 2021, when DANIELS was added as an additional signer. In approximately December 2021, HENTON changed the name on this account from ATOL to "The Perfect Choice Supportive Home Care."

From approximately January 1, 2018, to May 18, 2022, ECU 1 received approximately $1,400,000 in Medicaid payments from the State of Wisconsin, consisting of approximately 600 separate payments in the form of ACH deposits. During the same timeframe, HENTON and DANIELS withdrew approximately $1,064,000 in cash from ECU 1. Account records reflect that whenever Medicaid made deposits, those deposits were withdrawn almost in their entirety in cash the same day. Additionally, ECU 1 received approximately 213 cash deposits totaling approximately $441,000. There were several times when these deposits were in excess of $10,000 or were $10,000 exactly. These deposits were DTO proceeds.

During the same time frame mentioned above, approximately $150,000 was transferred from ECU 1 to ECU 2. Further, ECU 2 received approximately $140,000 in cash deposits during this same time frame. These deposits were also DTO proceeds.

Further analysis showed that despite ECU 1 purporting to be a business account for ATOL, bank records do not reflect the payment of common business expenses

23

including payroll, payments to nurses, clients, or other healthcare expenses from this account. Additionally, according to the Wisconsin Department of Workforce Development, ATOL did not report any wages. According to records obtained pursuant to an *ex parte* tax order, neither HENTON nor ATOL filed tax returns for 2019, 2020, or 2021.

Furthermore, HENTON and DANIELS opened bank accounts ending in x1789 and x3484 at Associated Bank under the name "Intelligent Investments." These two accounts were opened in January and February 2019 and were closed in August and September 2020, respectively. The account ending in x1789 received a total of $135,749.59 in cash deposits (accounting for 67% of incoming funds), and the account ending in x3484 received approximately $95,892.01 in cash deposits (accounting for 86% of incoming funds).

On October 16, 2020, DANIELS and HENTON opened Chase Bank account ending in x2062 in the name of "Intelligent Investments." Between approximately December 2020 and December 2021, the account ending in x2062 received approximately $99,000 in cash deposits. During this time, approximately $35,000 in payments to American Airlines were made, $30,000 in cash withdrawals were made, and approximately $17,000 in payments to hotels were paid from this account.

On March 31, 2022, DANIELS and HENTON opened another Chase Bank account ending in x8205 in the name of "Intelligent Investments." The signature card lists HENTON listed as the "President" and DANIELS as "Acting Secretary." In October 2022, DANIELS made at least three cash deposits totaling approximately $94,000 into this account.

Financial analysis of the Intelligent Investments bank accounts reflects that they did not operate as any type of legitimate business. Instead, these accounts were used to disguise the nature and origin of DTO proceeds. For example, in addition to the activities described above, at least three checks from Intelligent Investments, in the amounts of $15,000 (August 19, 2022), $17,750 (August 27, 2022), and $17,750 (September 8, 2022), were made out to DTO middleman EDWARDS and deposited into his Chase Bank account under the name "Tier One Records."

## CONCLUSION

DANIELS now admits that he is responsible for the distribution of at least 10 kilograms of fentanyl, at least 50 kilograms of cocaine, at least 15 kilograms of methamphetamine, at least 2 kilograms of heroin, at least 1 kilogram of cocaine base, and at least 100 pounds of marijuana because these amounts were reasonably foreseeable to him. DANIELS further admits that he possessed the firearms found in his Teutonia

24

Avenue residence on November 29, 2022, in furtherance of his drug trafficking activities. DANIELS also admits that he was involved in the use of various bank accounts to conceal and disguise the nature of source of the DTO's drug proceeds, and that he participated in a scheme to defraud Wisconsin Medicaid.