UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                    Case No. 22-CR-26

JOATHAN COLULA,

      Defendant.

## UNITED STATES' SENTENCING MEMORANDUM

For years, defendant Joathan Colula repeatedly distributed significant quantities of drugs—cocaine, fentanyl, and methamphetamine—as part of a nationwide drug trafficking organization (DTO). Indeed, his crimes were international in scope. The defendant sourced some of his drugs directly from Mexico, and he and his partner had direct ties to the Mexican cartel. The defendant's involvement in drug trafficking was equally far-reaching in terms of quantity. Each deal he made involved multiple kilograms of cocaine, pounds of methamphetamine, or thousands of fentanyl pills—sometimes all of these at once.

The defendant concealed the nature of this illegal activity by running his drug money through accounts in the name of real and fictious businesses, including a bail bonds company. He also used commercial airlines to receive hundreds of thousands of dollars in drug proceeds, to keep his operation flowing and profitable.

When officers repeatedly attempted to arrest him between late November 2022 and early February 2023, he evaded them by fleeing. Though he was aware of the warrant for his arrest and promised multiple times to turn himself in, he never did.

At no point has the defendant taken responsibility for his criminal actions. When he testified at his trial in July 2025, he tried to convince the jury that his only involvement with controlled substances was selling marijuana to Phillip Daniels—which he stressed was, in fact, legal in California. But the wiretap calls, text messages evidence, call detail records, seized parcel, surveillance and cooperator testimony all conclusively established that this testimony was a lie.

The defendant's repeated engagement in trafficking in extraordinary quantities of drugs, including fentanyl, which is fatal in very small amounts, deserves a substantial punishment. To promote respect for the law, generally deter this dangerous conduct and his obstruction of justice, and adequately address the seriousness of the defendant's crimes, the government respectfully requests that the Court sentence him to twenty years of imprisonment.

I.     **PROCEDURAL BACKGROUND**

In December 2022, the defendant was indicted in the Eastern District of Wisconsin for his involvement in a drug conspiracy, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A), and money laundering conspiracy, in violation of Title 18, United States Code, Sections 1956(h). A second superseding indictment returned in September 2023 maintained these same charges.

The defendant elected to proceed to trial in July 2025, and after eight days of testimony and argument, a jury found him guilty of participating in a drug conspiracy that distributed cocaine, fentanyl, methamphetamine, and marijuana. A sentencing hearing is scheduled for February 10, 2026.

**II.     THE ADVISORY GUIDELINE RANGE**

As calculated in the presentence report (PSR), the U.S. Sentencing Guidelines recommend a sentence of life imprisonment based on the facts of this case. PSR at ¶ 137. This recommendation stems from (1) a base offense level of 36 based upon the distribution of at least 1.2 kilograms of fentanyl, 150 kilograms of cocaine, 27.22 kilograms of methamphetamine, and 100 pounds of marijuana; (2) an upward adjustment for the defendant's aggravated role in the offense, pursuant to U.S.S.G. § 3B1.1; (3) an upward adjustment for his conviction for money laundering pursuant to § 1956; and (4) an upward adjustment for obstructing justice, pursuant to U.S.S.G. § 3C1.1. The advisory guideline range does not reflect any adjustment for acceptance of responsibility.

**III.    APPLICABLE LAW**

When imposing sentence, this Court must weigh the factors set forth in 18 U.S.C. § 3553(a):

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the advisory guideline range;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentencing disparities; and

(7) the need to provide restitution to any victims of the offense.

Courts should impose sentences that take a holistic view of a defendant's characteristics and conduct, as well as the impact of that conduct on the community. In doing so, "a judge may appropriately conduct an inquiry broad in scope, largely unlimited as to the kind of information he may consider, or the source from which it may come." *United States v. Jones*, 635 F.3d 909, 917 (7th Cir. 2011) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972)). This principle is echoed in 18 U.S.C. § 3661, which states that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See also* 18 U.S.C. § 3553(a)(1) (directing consideration of the "history and characteristics of the defendant"). "The facts that a sentencing judge finds in determining what sentence to impose—such facts as the defendant's criminal history, his cooperation or lack thereof in the government's investigation, and his remorse or lack thereof—need be found only by a preponderance of the evidence." *United States v. Horne*, 474 F.3d 1004, 1006 (7th Cir. 2007).

While the Sentencing Guidelines are no longer mandatory, they remain the "lodestar" of federal sentencing, "inform[ing] and instruct[ing] the district court's determination of an appropriate sentence." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016). Here, the defendant faces an advisory range of life in prison. This is

4

the result of the kinds and quantity of drugs trafficked by the defendant, the defendant's role in overseeing and organizing the distribution of drugs, and the defendant's obstruction conduct at trial.

## IV. FACTORS SUPPORTING THE GOVERNMENT'S RECOMMENDATION

### A. The Nature and Circumstances of the Offense

Together with Daniels, the defendant was one of the longest running members of this conspiracy. The defendant was one of Daniels' earliest cocaine sources, beginning in mid-2020 when he and co-conspirator Julian Ramirez, a/k/a "Shrimp," started supplying Daniels kilograms of cocaine on a consistent basis. While Daniels was driving the drugs back to the Midwest at first, records from FedEx and UPS from as early as January 2021 demonstrated that Daniels and the defendant began shipping the drugs within a few months. The defendant also began selling thousands of fentanyl pills and pounds of methamphetamine to Daniels. To fulfill the DTO's frequent, large orders, the defendant recruited and paid Julio Barraza to package and ship cocaine, fentanyl, and methamphetamine to various addresses in the Midwest.

Suffice to say, the defendant routinely sold deadly drugs. This was not a one-and-done affair, but a multi-year endeavor at a time when overdose deaths attributed to counterfeit fentanyl-laced pills was sharply increasing.[1] By the end of November 2020, the Centers for Disease Control cites 92,478 drug overdose deaths for the preceding twelve months.[2] Nor was the defendant merely selling dime bags on a street corner. He

---

[1] *See* Trends in and Characteristics of Drug Overdose Deaths Involving Illicitly Manufactured Fentanyls – United States 2019 – 2020, *https://www.cdc.gov/mmwr/volumes/70/wr/mm7050e3.htm* (last visited February 3, 2026).
[2] *See id.*

5

repeatedly orchestrated the movement of kilograms of drugs from Mexico to California, and then from California to the Midwest, using his connections to develop a nationwide drug enterprise.

This drug enterprise generated hundreds of thousands of dollars. To disguise the illegitimate nature of his proceeds and obfuscate law enforcement detection, the defendant also used his business account to launder money. The defendant was as the center of a DTO that was significant in its breadth and scope. The severity of his crime merits a substantial sentence.

### B.     The History and Characteristics of the Defendant

#### *1. The Defendant's Years-Long Conduct Overshadows His Lack of Criminal History*

The defendant has spent more than three years denying his integral and substantial role in this DTO, beginning from the moment his first evaded arrest. Once he was finally apprehended, he never showed interest in accepting responsibility for his actions. Additionally, according to a co-defendant, the defendant threatened that person by stating he would kill him/her if they didn't recant their statement. The defendant then pursued trial, where he adamantly and repeatedly denied being involved in selling cocaine, fentanyl, and methamphetamine.

Even now, the defendant continues to brand others as liars instead of admitting the truth, yet he has the audacity to argue that he should be given a reduction against his Guidelines offense level for acceptance of responsibility. As puzzling and tone-deaf as this argument is, he goes still further, objecting to the conservative calculation of the drug weight he is responsible for and arguing that the jury's finding as to the

6

mandatory minimum weights should control. The defendant's continued denials and objections speak volumes, and they are a far cry from showing remorse and contrition.

Moreover, the defendant reported growing up with two parents who loved and cared for him, supported him financially, and raised him in a safe neighborhood. These advantages during his childhood provide no insight as to why the defendant pursued a life of crime. Rather, it appears he did so *in spite* of these stabilizing influences. That the defendant would turn his back on the healthy foundation he was given and choose to engage in very serious and dangerous criminal conduct is cause for additional concern rather than a mitigating factor.

As discussed further below, the defendant's lack of criminal convictions is not, in this case, indicative of a life free from criminal activity, or an indicator that his involvement in this case was an anomaly. Simply evading detection for one's ongoing crimes should not be rewarded. For over three years, the defendant kept the gears of a large scale, sophisticated drug operation turning. The severity of his conduct and his failure to accept responsibility for it far outweigh any mitigation from his seeming lack of criminal history.

   2. *Defendant's History of Violence*

As explained in the presentence report, the defendant has five other arrests in California, including two involving battery and domestic abuse. As recently as June 23, 2021, the defendant was charged with two counts of inflicting corporal injury on a spouse or cohabitant and one count of child abuse. PSR ¶ 105. According to the police report, the defendant's now-wife, W.F., reported that earlier that night when she attempted to leave the defendant's home, he grabbed her by both arms and pulled her

back towards his residence before strangling her with both hands around her neck. Just before she lost consciousness, the defendant loosened his grip and she broke free and fled to her vehicle with their child, who witnessed the incident.

Officers noted a six-inch bruise to W.F.'s right forearm, bruising and scratching to her left forearm, and bruising to both sides of her neck. W.F. also disclosed that this was not the first time the defendant had put his hands on her. She indicated that the defendant has attempted to smother, strangle or suffocate her in the past, that she had made prior attempts to leave him, and that she was in fear for her safety.

While the conduct is uncharged, the report of the incident is important for the Court's consideration because it demonstrates the defendant's propensity for violence, a trait that falls squarely within his history and characteristics, and echoes the threats made to his cooperating co-defendant during the pendency of this case. Furthermore, any argument that the defendant was living a pro-social life and that this case was simply a blip on the radar screen of an otherwise law-abiding person should be rejected.

### 3. *The Defendant's Travel to Mexico*

The defendant's travel history, as documented by the Department of Homeland Security (HSI), reflects more than 55 crossings into the United States from Mexico. HSI keeps records of all entries into the United States from Mexico, reflected by a log that captures the date and times of the inbound travel. In the years leading up to his arrest in November 2022, the defendant's border crossings were more frequent. In 2020, the defendant crossed back into the United States twelve times. In the years 2016, 2017, and 2019, he crossed into the United States from Mexico six, eight, and seven times respectively.

When the defendant was interviewed by pre-trial services in California, however he claimed that he only traveled to Mexico three or four times a year. As the official crossing records demonstrate, his statement was simply false. Based on how this case has unfolded and the positions he's taken regarding the evidence, it is evident that this was a deliberate lie, designed to minimize the chances the court would see him as a flight risk and downplay his drug connections to Mexico, as he continues to do. His untruthfulness out of the gate set the stage for additional self-serving falsehoods throughout the pendency of this case and demonstrates that his acceptance of responsibility letter he wrote is hollow, a thinly-veiled attempt to attain a lower sentence.

### 4. The Defendant's Failure to Accept Responsibility

The defendant argues that he has accepted responsibility for dealing drugs. This argument is belied by his actions and testimony before the jury. The jury rejected his testimony and convicted him of dealing not only marijuana, but also fentanyl, cocaine, and methamphetamine. In his objections to the pre-sentence report, he continues to argue that all of the witnesses were lying about him. Yet the same time he filed these objections, he also filed a letter with the Court apologizing for his actions and claiming he understands their seriousness. This letter lacks specificity and sincerity. In failing to even describe what actions he's apologizing for, the defendant has laid bare his motivation, which is simply to check a box that he hopes will entitle him to a two-level reduction in his adjusted offense level. His professions are simply too vague to contribute meaningfully to the sentencing determination.

Regardless of how the Court interprets the defendant's letter, however, any claims the defendant makes that he has accepted responsibility are belied by his own words at trial. Even if he were sincere, which the government maintains he is not, it is a straightforward case of too little too late. The defendant can't have it both ways, both denying his guilt and claiming he has learned his lesson. His continued failure to truly accept responsibility for his criminal conduct thus weighs against him.

### C. The Need to Promote Respect for the Law

Promoting respect for the law in the context of drug trafficking is essential because these laws exist to protect public safety, preserve social order, and uphold the conditions necessary for communities to thrive. When individuals disregard drug regulations, the consequences reach far beyond their personal choices; they erode the shared norms that keep society functioning safely and fairly.

Drug laws safeguard the community from significant harm. Drug trafficking, especially when connected to Mexican cartels and/or guns, are strongly correlated with violence, addiction, accidental injuries, and community instability. These laws were enacted precisely because unchecked access to harmful substances produces predictable and measurable danger. Promoting respect for these laws ensures that individuals understand their role in preventing unnecessary harm.

Furthermore, violations of the drug laws undermine public trust and weaken the rule of law. When drug laws are routinely violated—or perceived as optional—it erodes confidence in the justice system. This weakening of the rule of law leads to more widespread noncompliance, making it harder for authorities to intervene effectively.

Importantly, respect for the law protects the rights and safety of innocent people. Drug trafficking and other crimes that accompany trafficking have a ripple effect across communities. When individuals ignore these laws, they aren't just endangering themselves; they impose risks on neighbors, families, and bystanders who have no role in the wrongdoing. Rampant drug and violent crimes place significant strain on a broad range of institutions, including law enforcement, the criminal justice system, political and government structures, healthcare, financial institutions, among others.

Promoting respect for the law through a firm sentence would address these ripple effects in a tangible way.

### D. The Need to Advance General Deterrence

A legal system that holds individuals accountable sends a clear message: harmful actions carry consequences. This deterrence effect is not only aimed at the individual who violated the law but also at others who might consider doing the same. Respect for the law strengthens deterrence, reducing the likelihood of future violations and thereby protecting the community. Additionally, it is important for individuals involved in high-level drug trafficking operations to be sentenced commensurate with the increased amount of harm they caused. In the defendant's case, he supplied Midwest communities with hundreds of kilograms of cocaine and pounds of fentanyl and methamphetamine. Through the sheer amount of drugs he trafficked, the defendant caused harm to countless Americans. Drug addiction can be a life-long affair for some, and the defendant's substantial contribution to this cycle warrants substantial consequences.

### E. Avoiding Unwarranted Sentencing Disparities

The 3353(a) factors also include avoiding unwarranted sentencing disparities. While this is important on several levels, perhaps none is so basic as avoiding disparate sentences between this defendant and his codefendants. The avoidance of unwarranted disparities is part of the reason Congress established the sentencing guidelines. *United States v. Gall*, 552 U.S. 38, 54 (2007); *see also United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009) (holding that a guideline sentence necessarily avoids unwarranted disparities and fully complies with § 3553(a)(6)).

Among the sentences that the Court has imposed to date, two in particular serve as useful benchmarks. Jimmy Gonzalez Macias, another California-based supplier, accepted responsibility and received a sentence of 15 years' imprisonment. Michael Williams, meanwhile, operated at the hub of Minnesota distribution operations and received a sentence of 20 years' imprisonment after declining to accept responsibility and being found guilty at trial.

While five years of the fifteen-year sentence for Jimmy Gonzalez Macias was attributed to possessing a firearm, the defendant is more culpable than Jimmy Gonzalez Macias, and the defendant's circumstances are more aggravated. First, the evidence shows the defendant distributed significantly more drugs that Gonzalez Macias. The defendant's shipments included anywhere from five to twenty kilograms of cocaine at a time, resulting in a total of at least 150 kilograms of cocaine. PSR ¶ 78. The defendant also routinely supplied the DTO with hundreds or thousands of fentanyl pills and pounds of methamphetamine. The evidence reflected that Gonzalez Macias, supplied in comparison only a few kilograms of cocaine and/or fentanyl to Daniels and the DTO on

12

fewer than five occasions, in addition to supplying four to five pounds of methamphetamine one a few occasions. The sheer difference in quantities of controlled substances, with the defendant trafficking over 100 more kilograms of drugs than Gonzalez Macias, warrants a higher sentence. Second, the defendant supplied the DTO far longer than Gonzalez Macias. Based upon years of shipping and bank records, intercepted calls and messages, and witness testimony, the defendant was one of the DTO's oldest and most-trusted sources of supply. Gonzalez Macias, in contrast, was a much newer source. The evidence reflected that Gonzalez Macias sold some controlled substances to DTO members Jameel Bradley Sr. and Itzel Cruz Gonzalez in early 2022, but he did not meet Daniels until November 2022, just weeks before his arrest. Third, the evidence showed that the defendant helped increase the scope of the DTO. While Gonzalez Macias had himself been recently introduced to the conspiracy, the defendant was expanding its horizons, connecting Daniels directly to major Mexican suppliers operating in Chicago who made introductory deals with him for ten to twenty kilograms of cocaine. Fourth, unlike Gonzalez Macias, the defendant has also been convicted of money laundering based on active steps he took the disguise and conceal his illicit proceeds in business bank accounts. Given the defendant's more culpable and aggravated role, a higher sentence is warranted in his case.

The defendant's case is both similar to and different from that of Williams. First, they are both responsible for significant quantities of dangerous drugs, with the difference being that the counterfeit fentanyl-laced pills, cocaine, and methamphetamine the defendant sold was in part distributed by Williams in Minnesota. Williams was not just a distributor for the conspiracy, however. Testimony

13

at trial revealed that, like the defendant, Williams also had suppliers in Mexico, and he also sold counterfeit fentanyl-laced pills to Daniels. Additionally, neither took responsibility for their actions, and both held aggravated roles within the conspiracy and testified falsely. While Williams had prior felony convictions and the defendant does not, the defendant was involved in the DTO for more than eighteen months longer than Williams and expanded the DTO in significant ways by recruiting Julio Barraza and connecting Daniels with sources of supply in Chicago. Furthermore, the defendant was convicted of a money laundering conspiracy whereas Williams was not.

Comparing the defendant's culpability and lack of acceptance of responsibility against his codefendants, the government is recommending a below-guidelines sentence of 20 years of imprisonment to avoid disparities with the sentences of other similarly situated defendants.

## V. CONCLUSION

For the reasons set forth above, and after careful consideration, the government submits that a sentence of 20 years in prison is sufficient but not greater than necessary to promote respect for the law, provide just punishment, deter other drug traffickers, and protect the public. Counsel for the government will make additional remarks at the sentencing hearing.

Dated at Milwaukee, Wisconsin, this 3rd day of February, 2026.

Respectfully submitted,

BRAD D. SCHIMEL
United States Attorney

By: *s/ Elizabeth Monfils*
Elizabeth Monfils

14

Erica J. Lounsberry (FL Bar No. 86095)
Assistant United States Attorneys
United States Attorney's Office
517 E. Wisconsin Avenue – Rm 530
Milwaukee, WI 53202
Phone: 414-297-1700