UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

   v.                                      Case No. 22-CR-26 (PP)

LENARD MONROE,

        Defendant.

---

**UNITED STATES' SENTENCING MEMORANDUM**

---

The United States, by its attorneys, Brad D. Schimel, United States Attorney for the Eastern District of Wisconsin, and Erica J. Lounsberry and Elizabeth M. Monfils, Assistant United States Attorneys, hereby submits the following memorandum to highlight aspects of defendant Lenard Monroe's offense conduct and history that are relevant for the Court's consideration at sentencing.

**I.    INTRODUCTION**

Lenard Monroe stands convicted of 23 different counts encompassing interrelated violations of four different criminal statutes: 18 executions of a healthcare fraud scheme, a conspiracy to violate the anti-kickback statute and a substantive violation of that section, wire fraud, and money laundering. His trial, which concluded on October 27, 2025, proved that Monroe owned and ran a Medicaid business that fraudulently billed for personal care services that were never provided. He incentivized co-defendant Phillip Daniels to refer and keep clients at his business by paying Daniels hundreds of thousands of dollars in illegal kickbacks. He also

1

used his status as a Medicaid provider to obtain COVID relief payments he didn't qualify for, and he spent the proceeds of his crimes on himself, including on a limited-edition Dodge Demon.

Monroe's crimes were deliberate and sustained over the course of several years. In a veritable layer cake of lies, he created a fake Medicaid business supported by fake timesheets and fake nurse visit records, filed fake corporate taxes that he used to support fake COVID relief applications, and deposited the spoils into fake business accounts that he used as personal slush funds. The longer Monroe got away with the scheme, the more brazen he became and the more money he took.

Despite the obviousness of these crimes, Monroe has never taken responsibility for them. Instead, he continues to deny his culpability and to blame others for his wrongdoing. Unmitigated in duration, in scope, or by repentance, this conduct plainly warrants a Guidelines sentence. The charges, the specifics of Monroe's offense conduct, his role in the offense, and his criminal history yield a range that starts at 151 months in prison. In this memorandum, the government explains why such a sentence is sufficient but not greater than necessary to achieve the central goals of administering just punishment, creating deterrence, and avoiding unwarranted sentencing disparities.

## II.     APPLICABLE LAW

In determining the appropriate sentence, the Court must consider the factors set forth in 18 U.S.C. § 3553(a). *United States v. Harris*, 490 F.3d 589, 593 (7th Cir. 2007). These factors include the nature and circumstances of the offense and the history and characteristics of the defendant; the United States Sentencing Guidelines (U.S.S.G. or "Guidelines") range; and the need to avoid unwarranted disparities among similarly situated defendants. Ultimately, the Court must impose a sentence sufficient, though not greater than necessary, to reflect the seriousness of

2

the offense, promote respect for the law, adequately punish the crimes committed, deter other criminal conduct, protect the public from the defendant, and provide for any particularized needs of the defendant. 18 U.S.C. § 3553(a)(2).

Courts should impose sentences that take a holistic view of a defendant's characteristics and conduct, as well as the impact of that conduct on the community. In doing so, "a judge may appropriately conduct an inquiry broad in scope, largely unlimited as to the kind of information he may consider, or the source from which it may come." *United States v. Jones*, 635 F.3d 909, 917 (7th Cir. 2011) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972)). This principle is echoed in 18 U.S.C. § 3661, which states that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See also* 18 U.S.C. § 3553(a)(1) (directing consideration of the "history and characteristics of the defendant"). "The facts that a sentencing judge finds in determining what sentence to impose…. need be found only by a preponderance of the evidence." *United States v. Horne*, 474 F.3d 1004, 1006 (7th Cir. 2007).

## III.    SUPPORT FOR THE UNITED STATES' RECOMMENDATION

### A.  Nature and Circumstances of the Offense

Monroe's conduct in this case violated several different criminal statutes and resulted in several different types of loss and harm. While the Court is well-familiar with the facts from the trial and the presentence investigation report ("PSR"), the offense conduct and its impact are summarized here to demonstrate why a Guidelines sentence is not only deserved but necessary.

3

### 1. Healthcare Fraud

The crux of the healthcare fraud scheme was that Monroe, through his personal care business, Wellness Personal Care Service ("Wellness"), billed Medicaid millions of dollars for services that were never performed. His former clients who were the subjects of the charged executions of the healthcare fraud scheme and who testified at trial recounted how they were led to believe a personal care worker would be coming every day of the week to help with tasks like cooking, cleaning, bathing and taking medication. They told the jury, however, that this never happened. Purported care workers like Joelle Massey and Michelle Hauck agreed the business was a sham and that all Monroe expected them to do was to fill out timesheets according to a predetermined template to justify his Medicaid claims. They explained that it would have been totally impossible for the small number of care workers signed up with Wellness to service the large number of clients that Monroe enrolled as alleged on the timesheets and in the billing.

The evidence at trial corroborated this testimony. It showed that Monroe knew his bills were false and that he intentionally defrauded Medicaid for at least three years. As illustrated by numerous exhibits, Monroe readily accepted timesheets with glaring defects because their only purpose was to paper the client files and check a box. The timesheets put care workers in up to eight places at once and alleged they worked as many as 53 hours a day. In a totally failed effort to avoid the appearance of overlap, they claimed that care like bathing, dressing and feeding was routinely performed in the middle of the night for some clients. The timesheets alleged that each client received the exact same services—like sponge baths, teeth brushing and linen changes on purportedly unused beds—on the same days of the week, regardless of how many hours of care they were approved for or what their unique needs were. They were "signed" by people who weren't clients, people who weren't care workers, people who were out of town, and even people

4

who were deceased. Rampant misspellings of caregiver and client names, dramatic changes in handwriting, and conflicting duplicate timesheets with different care worker names were dead giveaways that these documents were fake and forged.

This evidence didn't merely show that Monroe broke the technical rules of the Medicaid program, such as through improper calculation of travel time or billing prior to the receipt timesheets. Though those things were certainly also true, the evidence proved Monroe knew the claims he made to the government were an utter farce and that he continued to make more of them each year because the profits were high and the risk of detection in this trust-based program was low. As a result, Monroe caused significant harm to the clients who needed but did not receive care and the taxpayers who unwittingly funded the luxurious lifestyle Monroe never earned. Monroe's fraud scheme contributed to the erosion of trust in public benefit programs.

### 2. Kickback Scheme

Monroe would likely have been unable to accomplish the healthcare fraud scheme, at least on the scale seen here, without paying kickbacks. In less than two years, Monroe paid Phillip Daniels an estimated $640,132 in illegal kickbacks to identify Medicaid recipients and get them signed up for services they would never receive from Wellness Personal Care Service. This was in addition to the hundreds of thousands of dollars Monroe paid Daniels to retain and manage those clients, which included kickbacks given to the clients themselves and payments to Daniels' phony "personal care workers," who forged timesheets and dealt with client complaints. *See* PSR ¶¶ 11-12.

While only the kickbacks to Daniels were charged, the kickbacks Monroe knew Daniels used to get and keep clients for Monroe were just as important, and perhaps more insidious. Daniels testified that the reason he used housing instead of straight cash (as Monroe had

formerly done) to build a loyal clientele base was that it was typically worth far more to the vulnerable Medicaid recipients they targeted than its dollar value alone. Many of these clients could not independently secure housing due to obstacles like insufficient income, prior evictions, or criminal records. Daniels also testified that Monroe understood the leverage that this tactic created. When clients risked becoming homeless if they did not remain enrolled with Wellness Personal Care Service and Daniels' supportive care agency, First Response, it decreased the odds that they would switch agencies or report the lack of care to Medicaid or law enforcement. This manipulative tactic was not only highly effective, but it was highly detrimental to Monroe's clients, who effectively had to choose between getting the medical services they needed and keeping a roof over their heads.

### 3. COVID Relief Program Fraud

Monroe's Medicaid fraud was highly lucrative, personally netting him hundreds of thousands of dollars. Even so, he wanted more. When the COVID 19 pandemic wreaked havoc on legitimate businesses in early 2020, several federal government agencies rolled out relief programs to keep the economy and the healthcare system afloat. Not unlike Medicaid, these offerings were largely trust-based and designed to move money as quicky and efficiently as possible from government coffers into the hands of people and entities in need.

Just as he had done with the personal care services program, Monroe spotted an opportunity to claim public funds he was not entitled to with minimal effort or risk of detection. His largest single grab was a disbursement from the Department of Health Services' Health Resources and Services Administration's Provider Relief Fund: $274,167.90 in one go based on a four-page application and supporting documentation riddled with lies about his business

(starting with the fundamental untruth that he was a healthcare provider affected by the pandemic) and its financial health.

Monroe's wire fraud compounded his healthcare fraud by stacking one lie on top of another. It also confirmed Monroe's intent to defraud, dispelling any notion that Monroe acted unwittingly or was blind to his co-conspirators' actions or intentions.

### 4. Money Laundering

Finally, Monroe spent the fruits of his crimes on himself. One of the big-ticket items he bought with traceable proceeds was a limited-production muscle car designed for drag racing called a Dodge Demon. Though he already had two cars, including a BMW that he bought for $118,588 in 2021, he still had enough disposable "income" from his fraud to drop $131,612.49 cash on this toy in 2022. In interviews with law enforcement, Monroe's accountant, Lee Ellis, recalled Monroe showing off the car to him shortly after he purchased it. At trial, Ellis testified that when he questioned Monroe about whether Monroe was claiming such purchases as income, Monroe retorted that all of the business' revenues were his, and he could spend those monies on behalf of the business however he saw fit. This statement exemplifies Monroe's cavalier attitude toward his violations of the law.

### 5. Related Uncharged Crimes

Intertwined with the crimes of conviction were numerous similar uncharged financial crimes. As described in the PSR, Monroe's false claim for a Provider Relief Fund payment that underlies the wire fraud charge in Count 22 was actually his third false PRF claim, and just one of at least six different fraudulent COVID relief program applications. In total, he stole $347,543.94 from the government through these false submissions.

Underpinning these applications were false tax returns. Designed to exaggerate his expenses and minimize his income, the versions Monroe submitted with the applications often differed widely from those submitted to the Internal Revenue Service, which themselves were also false in different ways. *See*, *e.g.*, PSR ¶ 166. Monroe also used the company's payroll system to assist him and his business partner, Tammy Virgil, in committing tax fraud. Despite Monroe's lavish spending on luxury goods, entertainment, travel, and a house, he generated W-2s for himself claiming he earned only $9,000 in 2020 and $13,000 in 2021. Additionally, although bank records show Virgil ultimately received about one third of Wellness Personal Care Service's revenues, funneled to her discreetly through her daughter, Monroe generated W-2 forms for Virgil that showed she only received $18,000 in 2020 and $26,000 in 2021. By paying Virgil and many personal care workers mostly under the table, Monroe also failed to pay the IRS well over $100,000 in federal payroll taxes.

Thus, layers of fraud permeated virtually every aspect of Monroe's business and finances. Monroe seized any opportunity presented to him to take money he was not entitled to or to withhold money he owed. This pattern also extended to Monroe's personal life, as discussed below in the section entitled "Dishonesty concerning child support and public benefits."

## B. History and Characteristics of the Defendant

### 1. Prior criminal record

The PSR summarizes Monroe's criminal history, which spans more than 32 years, beginning when he was a young teen and continuing through his conduct in this case. Monroe falls into Sentencing Guidelines Criminal History Category II (PSR ¶ 221), owing to a 2003 conviction in this district for conspiracy to distribute five kilograms or more of cocaine and distribution of cocaine (PSR ¶ 171). As in this case, Monroe did not accept responsibility for

those offenses and was convicted following a jury trial. 2:03-CR-34, ECF No. 32. Although he was originally sentenced to 151 months in prison, he was re-sentenced a little over a year later to 97 months in prison after the filing of a Rule 35 motion. *Id*. at ECF Nos. 48, 52. The prison term was followed by five years on supervised release, during which Monroe accumulated several violations, including a failure to repay roughly a quarter of the ordered restitution, numerous missed drug screens, and multiple instances of traveling without permission. PSR ¶ 171.

Monroe's supervision was discharged in May of 2015, a little more than two years before he launched Wellness Personal Care Service. Perhaps due to his convictions, it appears Monroe did not return to drug trafficking. Perplexingly, however, the roughly seven years he spent in prison did not dissuade him from continuing to pursue a life of crime. Instead, Monroe evolved a more sophisticated approach, insulating himself from law enforcement attention by pursuing a criminal enterprise cleverly disguised as a legitimate business.

Monroe's record also includes several additional arrests that provide further cause for concern, some of which involve violence or firearms. For instance, in 1999 when Monroe was 25 years old, he was convicted of disorderly conduct after he threatened a woman with a firearm. PSR ¶ 170. Monroe was found to have two firearms, including one that was semi-automatic, when he was arrested for the federal drug case. PSR ¶ 171.

Monroe's prior arrests and convictions set him apart from other white-collar defendants, who often have no criminal history. His sustained pattern of criminal conduct, even after previously serving a significant prison sentence and having the benefits and accountability of supervision and programming (*see* PSR ¶¶ 171, 211), highlights the need for a Guidelines sentence in this case.

9

### 2. Personal and family history

As described in the PSR, Monroe's upbringing was not without difficulty. He lacked a relationship with his father, and while his mother did her best to provide for her children's needs, her struggles with addiction sometimes created other hardships for the family, such as inadequate food or interruptions in utilities. PSR ¶¶ 185-188. While he enjoyed positive relationships with maternal relatives and some of the men who were involved with his mother over the years, Monroe reports that others abused and took advantage of him and his mother. PSR ¶¶ 189-191. Although Monroe grew up in a neighborhood with frequent gunfire and police activity, he normalized these circumstances and reported feeling safe. PSR ¶ 192.

The government will not speculate what influence this background may have had on the decisions Monroe made in this case. In any event, the PSR did not identify any resulting ongoing treatment needs that might impact the type of sentence warranted here. Monroe has no known addictions, no mental health diagnoses, and no long-term health complications requiring specialized treatment. PSR ¶¶ 203, 205, 208-10.

Some of Monroe's family members have ventured takes on the interplay between Monroe's background and the charges in this case. After admitting she did not know the details of this case, Monroe's sister suggested that if he was involved in criminal activity, it must have been "to help his friends" or because he was "associating with "the wrong crowd." PSR ¶ 196. His son stated that Monroe is "an honest businessman" who had turned his life around following his prior prison term and helps those in need. PSR ¶ 199. He further opined that Monroe was deceived by his business partners and that he would never intentionally do anything illegal. *Id*. Their comments echo some of the blame-shifting remarks Monroe has made about his own situation, discussed in a separate subsection below.

While the government understands the inclination to rally behind a loved one, these speculations find no support in the mountain of evidence introduced at trial. Instead, the facts demonstrate that Monroe acted only to help himself, knowing full well how he achieved his profit margins. Furthermore, it seems Monroe has been no more introspective or contrite in his conversations with his family than he has been in court throughout the pendency of this case.[1] Thus, the exposition of Monroe's personal and familial background in the PSR does little to make sense of the choices Monroe made to break the law in the ways he did here or his refusal to take responsibility for those actions. If anything, it demonstrates that Monroe was not blind to the needs and realities of the community he chose to exploit, but that he used the vulnerable for his own gain in spite of that awareness.

### 3. Dishonesty concerning child support and public benefits

In his interview with Probation, Monroe sought to paint himself as an honest family man who is baffled about how he came to be charged in this case. He argues that a prison sentence would negatively impact his children, especially his youngest, because he would not be available to provide support. PSR ¶ 199. To the extent the support Monroe is referring to is financial, Monroe has previously tried to sidestep that responsibility by lying in court.

According to Milwaukee County court records, in February 2020, the mother of Monroe's youngest child filed a motion asking that Monroe be ordered to pay her child support. *See* Attachment A (docket for court case 2012FA00067). During a hearing held June 23, 2020, Monroe objected to the entry of a child support order. *Id*. Even though Wellness Personal Care Service had been in business for nearly three years at this point, and Monroe's conspiracy with Daniels was in full swing, he told the Court he was unemployed and only working occasional

---

[1] His son commented, for example, that Monroe "struggles to understand how he ended up in this situation." PSR ¶ 199.

bartending jobs. *See id*. The mother of his child protested that Monroe was claiming on Facebook that he owned a business, but in the end, the Court ordered Monroe to pay just $55.24 a month—less than two dollars a day. *Id*. Despite that extremely low amount and the financial "success" Monroe saw between that time and his arrest in November 2022, the PSR notes that as of the filing of that report, Monroe owes $5,607.12 in child support arrears and fees. PSR ¶ 198.

In addition to lying to avoid providing for his own child, while he traveled to Las Vegas and Dubai, bought luxury cars, and built himself a custom home, Monroe had the audacity to claim he needed public benefits. While he billed Medicaid for millions of dollars, he also claimed to qualify to be a Medicaid and FoodShare *recipient*. In a benefits application dated October 28, 2019, Monroe alleged that he was penniless. *See* Attachment B. He reported having no assets and no income, and he claimed to be homeless. *Id*. at 3-4. Meanwhile, the Chase Bank account on which Monroe was a signor showed he received $75,242.18 in October 2019 from Wisconsin Medicaid. That same month, Monroe withdrew $11,077 in cash from ATMs. By the following summer, Monroe was making more than double that amount. In June 2020 alone, he received $169,449.42 from Medicaid and withdrew $23,138 in cash from ATMs that month. This was a far cry from being broke, as he had claimed.[2]

While Monroe's circumstances undoubtedly changed after his arrest in this case, he continued to provide false information to Medicaid. On February 3, 2025, while this case was pending, he submitted a renewal application in which he claimed he was homeless. *See* Attachment C at 3. But this too was untrue; according to the PSR, Monroe has rented a "well maintained and well furnished" apartment in Brown Deer since November 2023.

---

[2] According to information received from these programs, Monroe only renounced his claim to these benefits in late August 2020, citing his new marriage as the reason he no longer needed them.

These anecdotes, on top of the fraud Monroe was convicted of, speak to the level of his greed and dishonesty. Apparently not content with everything he was already taking from Medicaid and other governmental agencies, he pinched whatever extra pennies he could from programs meant to help the needy, and from his own son. That degree of avarice warrants a significant punishment.

### 4. Acceptance of responsibility statement

Against the backdrop of this perplexing evidence, Monroe submitted responses to several questions under the heading of "Adjustment for Acceptance of Responsibility." PSR ¶ 119. His responses merely reiterate the false testimony he gave at trial.

When asked about his motive to commit the offense and the circumstances under which he became involved, he characterized this case as the result of carelessness, saying he didn't "thoroughly vet" his business partners or "thoroughly read" the documents and paperwork he was cross examined about. *See* PSR ¶ 119. But the *mens rea* for the crimes Monroe was convicted of was *knowingly*. The jury was instructed that this standard meant they had to find beyond a reasonable doubt that Monroe did not act "through ignorance, mistake, or accident." *See* ECF No. 728 at 22. The jury further had to find that he carried out healthcare fraud and kickback schemes *willfully*. *Id*. at 22, 27. The jury's guilty verdicts as to each charge in the indictment therefore conclusively reject these excuses.

But Monroe didn't stop there. He went on to speak of the emotional and financial impact of his crimes on his family and *himself*—not the government or his clients—before commenting, "I think my employees were the only victims." To be clear, Monroe had no employees; indeed, he testified at trial (though this was certainly not true) that he couldn't afford to keep anyone else on the books. Instead, Monroe employed only what he previously went to great pains to point out

13

were independent contractors—contractors who did little more than forge timesheets at Monroe's direction in exchange for a small cut of the take.

In making this comment, Monroe also took a not-so-subtle dig at the clients who testified, insinuating what he had stated more directly at trial, that they were lying and were not true "victims." But their testimony was credible, strongly corroborated by the testimony of other witnesses and by exhibits like text messages and business records. And the impacts of Monroe's crimes on them were real and substantial. During pretrial interviews, several of them broke down in tears or trailed off in bewilderment as they traced hardships they are currently experiencing to Monroe's theft of their public benefits.

Ultimately, without saying it in so many words, Monroe portrayed himself as the true victim here. He professed feeling "hurt and confused" as a result of this case but described himself as a survivor who could overcome this "obstacle," as if it were not of his own doing. In true martyr form he continued, "I try to be a man of reasoning and empathy even if it's at my expense, and maybe that's my downfall or considered a weakness in today's society." But Monroe is not being held to account for being too rational or too empathetic. In fact, there was little evidence of empathy to be found anywhere in the testimony or the PSR. Instead, Monroe must face judgment because he deliberately committed numerous felony crimes for his own material gain, a fact he appears unwilling or unable to accept. This level of denial is cause for concern and contributes to the need for a Guidelines sentence.

## C. Balancing the Primary Criminal Justice Objectives

### 1. Protecting the public, reflecting the seriousness of the offense and providing just punishment

There are multiple ways of measuring the impact of Monroe's crimes. Perhaps the most obvious is the total loss to the government. While it is difficult to assess just how deep the

current of fraud ran at Wellness, the evidence at trial proved that the claims for at least the 51 clients Monroe asked Phillip Daniels to manage were false. This included claims that predated Daniels' involvement, made for clients such as Claudia Virgil who were already receiving cash kickbacks in lieu of care. This fraud totaled at least the $2,543,216.62 that has been stipulated to as the restitution owing to Wisconsin Medicaid. In addition to the loss to Medicaid, Monroe took hundreds of thousands of dollars he wasn't entitled to from different COVID relief programs, including the $274,167 Phase Four Provider Relief Fund payment underlying his wire fraud conviction. He likely also caused large losses to the Internal Revenue Service with his patently false tax filings.

All of that roughly three million dollars in fraud came out of the pockets of American taxpayers. But the taxpayers were by no means the only everyday people affected by Monroe's crimes. While the government agencies discussed above are the victims of Monroe's crimes for legal purposes, Medicaid members like the ones who testified at trial were the people most impacted by his greed. Wellness' clients testified about their health conditions at the time Monroe billed for them. While some mainly had mobility limitations, others suffered from serious medical conditions that required daily attention. The testimony at trial demonstrated how Monroe, Daniels and their companies' failure to provide care put a significant strain on these clients and their families. For example, Kyra Allen testified that she was unable to hold a job because she was taking care of her father, U.A., full-time—a job Wellness was being paid $23 per hour to do. A.K. similarly testified that her husband at the time frequently missed work because he had to fill the role of her absent care worker. J.A. recounted her struggles trying to care for herself, let alone her four children, while continually hounding Joelle Massey, whom she believed was supposed to be her personal care worker, for help. When she learned for the first

15

time during trial that Wellness had collected nearly $78,000 for the services that were never provided to her, her jaw fell open in disbelief.

All of this is in addition to the indignities and uncertainties clients suffered while helping Monroe and his co-conspirators get away with their scheme. They reported being instructed to use medical equipment they did not need, to claim almost total incontinence, and to feign cognitive and intellectual impairments such as being unable to tell the time or write their names. Though several of them admitted to feeling shame about these lies and fear about what would happen to their ability to get real care in the future if they were caught taking part in this scheme, their levels of need were so desperate that they could not afford to refuse the assistance with rent and utilities that was offered in exchange for their silence.

While his clients had everything to lose, Monroe gained much while doing little. Though Monroe testified he was too busy with the day-to-day operations of his business to detect the swindle that everyone in his company *but* him was perpetrating, nothing could be further from the truth. Monroe's main contribution to Wellness was his ability to recruit expert fraudsters and to delegate nearly everything to them. He chose Daniels and his associates to do the hands-on work, signing up the clients, coaching them through medical evaluations, controlling their housing, paying their kickbacks, completing their timesheets, and performing the occasional chore or cigarette run to maintain the client roster. He chose Tammy Virgil, a nurse, to take care of the administrative aspects of the scheme, inflating clients' eligibility for service hours by padding their medical files, billing Medicaid the maximum allowable amount for each client each week, and papering the client files with fictitious nurse visit records. He chose nurses who would endorse whatever he asked for and turn a blind eye to questionable information and practices. Meanwhile, by his own admission, Monroe was only in charge of collecting the

16

laughably forged timesheets (which he claims he saw nothing wrong with). While his partners hustled for their ill-gotten gains, Monroe happily sat back and watched the proceeds flow into his accounts—hundreds of thousands of dollars that he paid himself without doing anything to earn it.

Monroe's choice to delegate, however, does not diminish his responsibility. The evidence at trial proved that Monroe fully subscribed to the devious and deceptive tactics his chosen partners used. Monroe was elated to learn Daniels' secrets for keeping clients beholden to him, and he often pushed Daniels to take things a step further, onboarding as many clients as possible while giving them the minimum necessary to avoid detection. This con proved so profitable for Monroe that he heralded it as a "printing press."

To this day, Monroe apparently sees nothing wrong or unusual with becoming rich off a government program while doing no work. The high dollar amount he stole, combined with his blasé attitude, suggest a strong sentence is needed. The highly damaging effects of Monroe's actions on the personal care clients who did not receive the services they needed and on society's faith in public programs that are so egregiously abused, also support a Guidelines sentence. The public needs to be protected from further offending by Monroe, and incapacitation will help achieve that objective.

### 2. Providing adequate deterrence and promoting respect for the law

The sentence the Court imposes must also consider the goals of creating specific and general deterrence and promoting respect for the law. *See* 18 U.S.C. 3553(a)(2)(A)-(B). With respect to specific deterrence, the PSR indicates that Monroe claims to still be involved in the business world. It states that in 2022, Monroe started a business buying and selling homes. PSR ¶ 213. It also states that he plans to continue this line of work in the future. PSR ¶ 216. Given

17

Monroe's previous prolonged involvement in fraud and other criminal activity, and given his failure to independently recognize the seriousness of his conduct, it is important that the sentence imposed in this case deter Monroe from returning to old habits to get ahead in the future.

Perhaps even more importantly, Monroe's sentence has the potential to disincentivize the criminal activity of others. Healthcare fraud is lamentably widespread in the United States. In 2023, the Centers for Medicare and Medicaid Services estimated that 6.78 percent of claims submitted to Wisconsin Medicaid were paid in error, while a whopping average of 15.62% of Medicaid payments nationally should not have been made.[3] While not all of this activity is fraud-related, much of it is. In 2018, around the time Monroe launched his Medicaid business, the National Health Care Anti-Fraud Association estimated that somewhere between three and ten percent of all expenditures in the American healthcare system were lost to fraud, waste and abuse.[4] The Personal Care Service program that Monroe targeted is especially vulnerable to abuse, as care is provided by unskilled workers in a home setting. While no hard statistics on the overall prevalence of personal care agency fraud are available, anecdotally, the Medicaid Fraud Control Units' Annual Report indicates that of the 487 Medicaid fraud defendants who were convicted in Fiscal Year 2024, fully two thirds were personal care workers (298) or home health agencies (25).[5]

Although it is common, this type of crime is uniquely susceptible to the deterrence that comes from strong sentences. In the context of a healthcare fraud case, *United States v. Brown*,

---

[3] Wisconsin Dept. of Health Svcs, *Payment Error Rate Measurement Resources*, https://www.forwardhealth.wi.gov/WIPortal/content/Provider/PERM/index.htm.spage (last visited Feb. 25, 2026).
[4] NHCAA, *The Challenge of Health Care Fraud*, https://www.nhcaa.org/tools-insights/about-health-care-fraud/the-challenge-of-health-care-fraud/#:~:text=Everyone%20Shares%20the%20Burden%20of,as%20reduced%20benefits%20or%20coverage.
[5] DHHS-OIG, *Medicaid Fraud Control Units Annual Report: Fiscal Year 2024*, at p. 4, available at https://oig.hhs.gov/ documents/evaluation/10227/OEI-09-25-00090.pdf.

18

the Seventh Circuit held that the deterrent value of a sentence depends largely on the type of crime being deterred:

> In determining the importance of deterrence in crafting a sentence, the sentencing court must answer the situation from the perspective of the prospective offender. From that perspective, the likelihood of getting caught depends not simply on the amount of resources that the Government expends on a particular type of crime, but the frequency with which the particular crime is committed and the ease with which it can be committed and go undetected. Indeed, Mr. Brown observed in his brief that "health care fraud ... seem[s] to continue unabated." The vast size and complexity of the Medicare program makes fraud detection especially difficult.

880 F.3d 399, 406 (7th Cir. 2018). The Seventh Circuit further agreed with other federal circuits that "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *Id.* at 405 (quoting *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014).

Crimes that are the most lucrative compared to their relative risk of detection require strong sentences to counteract their attractiveness to would-be criminals. *United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997). By imposing a Guidelines sentence in response to the magnitude of Monroe's fraud against the government and his failure to recognize or accept his responsibility, the Court can help shift the risk-reward calculus for white collar offenders who find the Medicaid program tempting and easy to abuse.

### 3. Avoiding unwarranted sentencing disparities

The avoidance of unwarranted disparities is part of the reason Congress established the Sentencing Guidelines. *United States v. Gall*, 552 U.S. 38, 54 (2007). A Guideline sentence necessarily avoids unwarranted disparities and fully complies with § 3553(a)(6). *See United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). Here, Monroe's Sentencing Guidelines range incorporates many of the most useful points of comparison between this case and the cases of other fraud offenders. His specific offense characteristics and enhancements counsel increases

19

in his sentence to account for the total loss amount, his abuse of a government program, his leadership role in the scheme, and his efforts to obstruct justice in the form of false testimony, among others. Each of these facts and factors should contribute to the sentence Monroe receives, and the imposition of sentence within the range recommended by the Sentencing Guidelines would do just that.

Additionally, imposing a Guidelines sentence in this case would also avoid unwarranted disparities by bringing Monroe's sentence in line with that of a very similarly situated defendant recently sentenced by this Court: Precious Cruse. On January 23, 2026, this Court sentenced Cruse to 87 months in prison—the low end of her recommended U.S. Sentencing Guidelines range—followed by two minimum mandatory prison terms of two years on two counts of aggravated identity theft, running concurrent to one another, for a total sentence of 111 months in prison followed by three years on supervised release. *United States v. Cruse*, 2:23-CR-149, ECF No. 96. Monroe and Cruse's cases have much in common. Like Monroe, Cruse defrauded Medicaid for a substantial amount of money. Like Monroe, Cruse took advantage of people in need, offering paltry kickbacks in lieu of the vital services Medicaid paid for. Like Monroe, Cruse also seized other opportunities besides Medicaid fraud to scam her way to wealth. Like Monroe, Cruse continued to engage in fraud even after being charged. Like Monroe, Cruse laundered the proceeds of her fraud on lavish purchases for herself. Like Monroe, Cruse perjured herself during her trial, blaming others and claiming the witnesses were all lying, despite her testimony flying in the face of hundreds of physical exhibits. And like Monroe, Cruse never took accountability or expressed remorse for her actions. Considering these facts, this Court found no compelling reason to depart from the Sentencing Guidelines. The government submits that the Court should reach the same conclusion in this case.

In addition to these similarities in the offense conduct, the offenses of conviction in the two cases were also extremely similar. Cruse was convicted of nine executions of a healthcare fraud scheme, two counts of aggravated identity theft, three counts of false statements related to healthcare, two violations of the antikickback statute, and one count of money laundering. Monroe was convicted of eighteen executions of a healthcare fraud scheme, one substantive violation and a conspiracy to violate the antikickback statute, one count of wire fraud, and one count of money laundering. Although it is true that Cruse's aggravated identity theft charges carried consecutive minimum mandatory terms that contributed to the total length of Cruse's sentence, despite not being charged under that statute, Monroe engaged in nearly identical conduct when he billed Medicaid for hundreds of hours of care allegedly provided to clients who not only received no care but had no idea they were even enrolled in personal care services with Monroe's company. Thus, Monroe's conduct, and the punishment he accordingly deserves, are highly similar to Cruse's.

Indeed, in many ways, Monroe's conduct was even more aggravated than Cruse's, justifying the incrementally higher sentence recommended by his Guidelines range. A key difference in their recommended sentencing ranges is the difference between their criminal history categories. While Cruse scored zero criminal history points and had never served time before, Monroe scored three due to a previous sentence of 97 months in federal prison. Another is the difference in the total loss amount. While Cruse stole over $800,000 in an eight-month period, Monroe more than tripled her take, operating at a similar rate to hers for at least three years and causing a loss to Medicaid of over 2.5 million dollars. Additionally, though it does not factor into the Guidelines score, while Cruse was in her late twenties at the time she committed her crimes, Monroe was in his mid-to-late forties—a season of life where most people are

expected to have moved on from youthful indiscretions. These meaningful distinctions deserve to be factored into Monroe's sentence, and a sentence at the low end of Monroe's Guidelines range would appropriately do that.

## IV. Conclusion

For the reasons set forth above, and after careful consideration, the United States submits that a sentence of 151 months in prison, which is at the low end of Monroe's Guidelines, is sufficient but not greater than necessary to promote respect for the law, provide just punishment, deter similar criminal conduct, and protect the public. Counsel for the government will make additional remarks at the sentencing hearing.

Dated at Milwaukee, Wisconsin, this 3rd day of March, 2026.

<div style="margin-left:40%">

Respectfully submitted,

BRAD D. SCHIMEL
United States Attorney

By:     */s/ Erica J. Lounsberry*
ERICA J. LOUNSBERRY (FL Bar No. 86095)
Assistant United States Attorney

*/s/ Elizabeth M. Monfils*
Elizabeth M. Monfils (WI Bar No. 1061622)
Assistant United States Attorney

Office of the United States Attorney
Eastern District of Wisconsin
517 E. Wisconsin Ave., Room 530
Milwaukee, WI 53202
Tel: (414) 297-1700
Fax: (414) 297-1738

</div>